**BISCAYNE FEDERAL SAVINGS & LOAN ASSOCIATION and Kaufman & Broad, Inc., Plaintiffs,**

v.

**FEDERAL HOME LOAN BANK BOARD, Richard T. Pratt, Edward Gray, Jamie Jackson, Thomas P. Vartanian, D. James Croft, Federal Savings & Loan Insurance Corporation, H. Brent Beesley, New Biscayne Federal Savings & Loan Association of Miami, Stanley Warranch, Charles T. Babcock, Jr., Kenneth Kamberg, R. Bruce Ricks and Ray M. Shaw, Defendants.**

No. 83–815–CIV–EPS.

United States District Court,
S.D. Florida,
Miami Division.

Sept. 9, 1983.

Bruce W. Greer, Miami, Fla., for plaintiffs.

Eben G. Crawford, Cleveland, Ohio, John Gunther, Washington, D.C., Ana T. Barrett, Don Lynn, Miami, Fla., for defendants.

## MEMORANDUM OPINION

SPELLMAN, District Judge.

### INTRODUCTION

In a closed meeting held on April 6, 1983, the Federal Home Loan Bank Board (FHLBB) adopted two resolutions which form the basis of Plaintiffs' complaint in this case. FHLBB Resolution 83–184 rejected Plaintiffs' recapitalization proposal designed to infuse new capital into the financially troubled Biscayne Federal Savings and Loan Association (Biscayne). FHLBB Resolution 83–185, adopted a short time thereafter, placed Biscayne in receivership under the control of the Federal Savings and Loan Insurance Corporation (FSLIC).[1]

Within an hour of the promulgation of the FHLBB resolutions, FSLIC officials entered each of Biscayne's 34 branch offices, assumed control of the Association, ousted several of Biscayne's senior officers and transferred Biscayne's assets to the newly formed New Biscayne Federal Savings and Loan Association (New Biscayne).[2]

1. The appointment of the receiver was made pursuant to 12 U.S.C. § 1464(d)(6)(A) which states in pertinent part:

The grounds for the appointment of a conservator or receiver for an association shall be one or more of the following: (i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members; (ii) substantial dissipation of assets or earnings due to any violation or violations of law, rules or regulations, or to any unsafe or unsound practice or practices; (iii) an unsafe or unsound condition to transact business; (iv) willful violation of a cease-and-desist order which has become final; (v) concealment of books, papers, records or assets of the association for inspection to any examiner or to any lawful agent of the Board. The Board shall have exclusive power and jurisdiction to appoint a conservator or receiver. If, in the opinion of the Board, a ground for the appointment of a conservator or receiver as herein provided exists, the Board is authorized to appoint ex parte and without notice a conservator or receiver for the association.

The FHLBB authority to appoint the FSLIC to be receiver is contained in 12 U.S.C. § 1464(d)(6)(D) which states in pertinent part:

The Board shall appoint only the Federal Savings and Loan Insurance Corporation as receiver for an association, and said Corporation shall have the power to buy at its own sale as receiver, subject to approval of the Board.

2. New Biscayne Federal Savings and Loan Association was federally chartered as a mutual association on April 6, 1983 pursuant to FHLBB Resolution 83–186. FSLIC transferred all of the assets and liabilities of Biscayne to New Biscayne on April 6, 1983 pursuant to FHLBB Resolution 83–187 and 83–188. The statutory authority for these actions is found in 12 U.S.C. § 1729(a) and (b) which state:

*Availability of accounts; organization of new association*

(a) In order to facilitate the liquidation of insured institutions, the Corporation is authorized (1) to contract with any insured institution with respect to the making available of insured accounts to the insured members of any insured institution in default, or (2) to provide for the organization of a new Federal savings and loan association for such purpose subject to the approval of the Federal Home Loan Bank Board.

*Powers of Corporation on default of Federal Savings and Loan Associations*

(b) In the event that a Federal savings and loan association is in default, the Corporation shall be appointed as conservator or receiver and is authorized as such to (1) to take over the assets of and operate such association, (2) to take such action as may be necessary to put in a sound and solvent condition, (3) to merge it with another insured institution, (4) to organize a new Federal savings and loan association to take over its assets, or (5) to proceed to liquidate its assets in an orderly manner, whichever shall appear to be to the best interests of the insured members of the association in default; and in any event the Corporation shall pay the insurance as provided in section 1728 of this title and all valid credit obligations of such association. The surrender and transfer to the Corporation of an insured account in any such association which is in default shall subrogate the Corporation with respect to such insured account, but shall not affect any right which the insured member may have in the uninsured portion of his account or any right which he may have to participate in the distribution of the net proceeds remaining from the disposition of the assets of such association.

Within three hours of the FHLBB's actions, Biscayne and its principal shareholder, Kaufman and Broad, Inc. (KB), filed the complaint in this action accompanied by a motion for a temporary restraining order.[3] Plaintiffs prayed for the return of the Association to their control. An immediate hearing was set that evening.

The parties' characterization on April 6 of the FHLBB actions became the dominant recurring theme throughout the litigation. Plaintiffs asserted that the seizure of Biscayne by an army of myrmidons dispatched from Washington, D.C. culminated 16 months of "Janus-faced" and outrageous behavior by the FHLBB towards Biscayne and KB. Such behavior, Plaintiffs argued, drove Biscayne to its knees and caused it to become statutorily insolvent.

Defendants contended that Plaintiffs' histrionics obscured the truth and the simple legal issues before the Court. Defendants averred that although they were under no compunction to negotiate with Plaintiffs, they indulged Biscayne and KB with endless months of negotiations in an effort to solve Biscayne's financial woes. Defendants contend that with Biscayne approaching $30 million negative net worth and insisting that the FHLBB bail out the Association with the infusion of public funds, the FHLBB had no alternative save appointing a receiver. The appointment of a receiver, Defendants argued, was authorized by statute to protect the depositors and the public confidence. Such appointment, Defendants asserted, was one of the risks of doing business with FHLBB and receiving insurance from FSLIC.

The Court denied Plaintiffs' motion for a temporary restraining order on April 6, 1983. *Biscayne Federal Savings and Loan Association, et al. v. Federal Home Loan Bank Board, et al.*, 561 F.Supp. 1046 (S.D. Fla.1983), *appeal docketed*, No. 83–5432 (11th Cir. June 6, 1983). In compliance with the statutory mandate that this cause be heard on an expedited basis and in recognition that the public interest necessitated a rapid resolution, the Court ordered the immediate commencement of discovery and it scheduled opening arguments in the trial within three weeks.[4]

In denying the motion for a temporary restraining order, the Court invoked the All Writs Act, 28 U.S.C. § 1651, and instructed Defendants not to undertake any actions in the management of New Biscayne that could drastically alter the financial or organizational structure of Biscayne. Aware that the All Writs Act should not be invoked to circumvent the requirements for a temporary restraining order pursuant to Rule 65(b), Fed.R.Civ.P., the Court felt that the complete transformation of Biscayne during the pendency of the trial could result in a hollow victory for the Plaintiffs should they ultimately prevail. A complete dissipation of assets would effectively deny the Court jurisdiction over the *res*—the Association and its assets—in this proceeding and prevent the Court from restoring the Association to the Plaintiffs. 561 F.Supp. at 1049–50. *See also Florida Medical Association v. U.S. Department of Health, Education and Welfare*, 601 F.2d 199 (5th Cir. 1979).

3. Plaintiffs' action was brought pursuant to § 1464(d)(6)(A) which states in pertinent part: In the event of such appointment, the association may, within thirty days thereafter, bring an action in the United States district court for the judicial district in which the home office of such association is located, or in the United States District Court for the District of Columbia, for an order requiring the Board to remove such conservator or receiver, and the court shall upon the merits dismiss such action or direct the Board to remove such conservator or receiver. Such proceedings shall be given precedence over other cases pending in such courts, and shall be in every way expedited. Upon the commencement of such an action, the court having jurisdiction of any other action or proceeding authorized under this subsection to which the association is a party shall stay such action or proceeding during the pendency of the action for removal of the conservator or receiver.

4. The statutory mandate for expedited handling of this matter is found in the last sentence of 12 U.S.C. § 1464(d)(6)(A). *See supra*, note 1. The parties agreed to the expedited handling of this matter.

The short amount of time allotted for discovery placed a great strain on the parties as well as on the Court. The parties conducted numerous depositions in Miami, Washington, D.C., and New York. As many as 50,000 pages of documents were exchanged. The efforts of the parties and their response to this Court's demands cannot go without comment. The filing of the complaint through closing arguments after trial consumed a period of only 63 days. This could not have occurred without the full cooperation of the two outstanding law firms and trial counsel for both parties.

The FHLBB based the appointment of a receiver on its powers delineated in 12 U.S.C. § 1464(d)(6)(A).[5] The FHLBB cited subsections (i) and (iii) as grounds for the appointment.[6] These subsections allow for appointment of a receiver for the following reasons:

> (i) insolvency in that the assets of the association are less than its obligations to its creditors and others, including its members;
>
> (iii) an unsafe or unsound condition to transact business.

12 U.S.C. § 1464(d)(6)(A)(i) and (iii).

Plaintiffs' second amended complaint contains nine counts. Counts I through V name the FHLBB, the FSLIC and FHLBB officials in their official capacities. Counts VI through IX name the individuals in their individual capacity under a *Bivens* claim. *See Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See also Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980).

The Court bifurcated Counts I through V from Counts VI through IX. This opinion concerns Counts I through V.

> Counts I through V allege the following:
> Count I: Biscayne was statutorily insolvent pursuant to § 1464(d)(6)(A)(i); however, the FHLBB is estopped from asserting insolvency as a basis for the appoint-

ment because "defendants, singly and in concert", created that insolvency. Biscayne was not in an unsafe and unsound condition pursuant to § 1464(d)(6)(A)(iii).
Count II: The FHLBB's appointment of a receiver constituted "an abuse of discretion", was "arbitrary and capricious, contrary to prior representations" and "not warranted by the facts and circumstances".

Count III: In view of the sixteen (16) month history of negotiations between the FHLBB/FSLIC and plaintiffs, in view of the absence of any exigent circumstances suggesting that Biscayne Federal was in danger of imminent financial collapse or that the public interest in the integrity of a financial institution required such action, and in view of contrary representations by defendants, the *ex parte* appointment of a receiver for Biscayne Federal was an abuse of discretion.

Count IV: Defendants' assertions that Biscayne's shareholders had no property interest and that the appointment of a receiver was undertaken to extinguish the cloud of shareholders' interest in Biscayne rendered the *ex parte* appointment of the receiver a breach of Plaintiffs' due process rights under the Fifth Amendment.

Count V: The defendants have engaged in unequal treatment of similarly situated savings and loan associations who are admittedly insolvent. The defendants' imposition of a receivership over insolvent Biscayne Federal while choosing not to impose a receivership over similarly situated savings and loan associations constitutes unequal treatment under the law in violation of the guarantees of the Fifth Amendment.

Plaintiffs concluded:
WHEREFORE, because defendants' actions as alleged in Counts I, II, III, IV and V in appointing a receiver for Biscayne *ex parte* were improper, unwarranted, an abuse of discretion, and in

---

**5.** *See supra,* note 1.

**6.** FHLBB Resolution 83–185.

violation of the Fifth Amendment, applicable federal statutes and regulations promulgated thereunder, plaintiffs request that this Court enter an Order removing the receiver, restoring the *status quo* and requiring FHLBB/FSLIC to agree to a plan that would resolve Biscayne Federal's net worth and solvency problems. Plaintiffs also request that this court grant whatever other relief it deems just and proper including, but not limited to, an award of attorneys' fees.

## ISSUES BEFORE THE COURT

Plaintiffs assert that this case presents two issues for resolution: 1) whether one of the statutory criteria for the appointment of a receiver existed on April 6; and 2) whether, upon the finding that a statutory criterion existed, the FHLBB's decision to appoint a receiver was "proper".

Defendants responded to each amended complaint with a motion to dismiss. The Court reserved ruling on the dismissal motions. Responsive pleadings were filed.

Defendants dispute Plaintiffs' formulation of the triable issues before the Court. They contend that the only reviewable issue for the Court is whether one of the statutory criteria existed on April 6. Defendants argue that once the Court is satisfied that the FHLBB's decision finding the existence of one of the criteria was not an abuse of discretion, Plaintiffs' cause must fail.

Defendants contend that the FHLBB's decision to appoint a receiver, once one of the criteria is met, is an exercise of its discretion which is beyond the permissible scope of judicial scrutiny. *See Vermont*

*Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1977). They assert that the FHLBB cannot be estopped from asserting insolvency as a basis for the appointment of a receiver, regardless of the extent of the alleged egregious behavior.

Defendants argue that the issue of Biscayne's unsafe and unsound condition need not be reached since Biscayne has stipulated to its statutory insolvency as of April 6. This stipulation, they argue vehemently, mandates dismissal of the case. Defendants presented no evidence to rebut Plaintiffs' contention that Biscayne was not in an unsound or unsafe condition on April 6, 1983.

Defendants argue that Plaintiffs' constitutional claims (Counts IV and V) have been foreclosed by previous rulings and are not properly triable in a § 1464(d)(6)(A) action.

The Court was initially inclined to accept Defendants' representation that the only triable issue was whether one of the statutory criteria was met. Defendants find support for their proposition in at least one other District Court opinion. *See Telegraph Savings and Loan Association v. Federal Savings and Loan Insurance Corporation,* 564 F.Supp. 862, 870 (N.D.Ill.1981) (memorandum opinion), *affirmed, Telegraph Savings and Loan Association v. Schilling,* 703 F.2d 1019 (7th Cir.1983). *But see Washington Federal Savings and Loan Association v. Federal Home Loan Bank Board,* 526 F.Supp. 343, 353–54 (N.D.Ohio 1981).[7] It appears, however, that the Court in *Telegraph Savings* was not confronted

---

**7.** In *Telegraph Savings,* Judge Grady articulated the issue for review as follows:

We are concerned in this proceeding not with the reasonableness or wisdom of the Board's conduct, but only with the question of whether the requirements of § 1729(c)(2) existed at the time Telegraph passed into receivership. Whether the Board should be able to take such action once those requirements have been met is one of those "fundamental policy questions appropriately resolved by Congress.... [which] are not subject to re-examination in the federal courts under the guise of judicial review of agency action."

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council,* 435 U.S. 519, 558 [98 S.Ct. 1197, 1219, 55 L.Ed.2d 460] (1977); *see also Radio Corporation of America v. U.S.,* 341 U.S. 412, 415 [71 S.Ct. 806, 807, 95 L.Ed. 1062] (1951) ("courts should not overrule an administrative action merely because they disagree with its wisdom.") *Telegraph Savings and Loan Association v. Federal Savings and Loan Insurance Corporation,* 564 F.Supp. 862 at 870 (N.D.Ill.1981). The *Telegraph* case involved a closing of a state chartered association. Therefore, 12 U.S.C. § 1729(c)(2) was invoked. There are several

with accusations that the Board had engaged in outrageous behavior.

In another District Court case where Plaintiffs made serious allegations concerning the FHLBB's behavior, the court framed the triable issues along the lines proposed by the Plaintiffs in the present action. *Fidelity Savings and Loan Association v. Federal Home Loan Bank Board*, 540 F.Supp. 1374 (N.D.Cal.1982), *reversed on other grounds*, 689 F.2d 803 (9th Cir.1982), *cert. denied*, —— U.S. ——, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983).[8] The court stated:

> This court is not to substitute itself for the Federal Home Loan Bank Board in the decision to exercise its jurisdiction, if it is present. Rather, once the court determines that the three statutory prerequisites have been satisfied, *it will not disturb the decision of the Board to exercise its jurisdiction unless there has been an abuse of discretion in the exercise of that power.*
>
> Therefore the issues before this court are (1) whether, when looking at all the evidence that was available to the Board and that information subsequently discovered, the three statutory prerequisites were satisfied; *and (2) whether the Board's exercise of jurisdiction constituted an abuse of discretion.*

540 F.Supp. at 1378. (Emphasis added).

■ The Court believes that it is compelled to look beyond the issue of whether one of the statutory criteria has been met when the allegations indicate that the agency may have acted in an outrageous manner and in contravention of its statutory purpose. Regardless of whether the statutory prerequisites have been met, the doctrine of agency discretion may not be used to insulate the Board from judicial scrutiny when serious agency abuses offend decency. The Court ordered this action to address itself to whether one of the statutory criteria had been met and whether the FHLBB properly exercised its discretion when it appointed the receiver.

■ The Court does not agree with Defendants' argument that Plaintiffs' constitutional claims (Claims IV and V) are not cognizable in a § 1464(d)(6)(A) action. The Court believes that § 1464(d)(6)(A) should not be read in a vacuum or apart from other applicable standards of review under the Administrative Procedure Act where such standards dovetail with the statute and where the legislative history does not evince a Congressional intent to preclude the Court from making such an inquiry. *See Johnson v. Robinson*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974). Accordingly, the constitutional issues were addressed by the parties pursuant to 5 U.S.C. § 706(2)(B).[9] *See Unity Savings Association v. Federal Savings and Loan Associa-*

additional elements which must be found before a receiver may be appointed for a state chartered association. Under § 1729(c)(2) one of the criteria outlined in § 1464(d)(6)(A) must exist. Therefore, the characterization of the issues to be resolved and the scope of judicial review allowed in *Telegraph* are relevant to this case.

In *Washington Federal*, the Plaintiff was placed in receivership on the grounds that it was in unsafe and unsound condition to transact business and that its assets had substantially dissipated due to violations of law or regularities and to unsafe and unsound practices. *Washington Federal*, 526 F.Supp. at 353. The court stated, "The issue before the Court is whether the Bank Board, having considered the relevant factors as defined by the court, abused its discretion in appointing a receiver for Washington Federal." *Washington Federal*, 526 F.Supp. at 401. The court also stated:

> The grant of exclusive power, however, is not construed to convey to the Board absolute power to decide whether a ground exists for appointing a receiver. As this court has ruled, this court must decide whether the Board abused its discretion in reaching an opinion that a receiver should be appointed. Under [*Citizens to Preserve*] *Overton Park,* [*v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) ], *supra,* this court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."

*Washington Federal*, 526 F.Supp. at 353–54.

8. *Fidelity Savings* involved a closing under state law. The court's formulation of the triable issues in that case are relevant to the present case. *See supra,* note F.

9. 5 U.S.C. § 706(2)(B) states:

*tion,* 573 F.Supp. 137, 140–41 (N.D.Ill. May 31, 1983).

The opinion that follows constitutes the Court's findings of fact and conclusions of law as required by Rule 52(a), Federal Rules of Civil Procedure.

## SCOPE OF REVIEW

Prior to discussing the facts of this case, the Court shall address the scope of its review. This issue was raised by the Court *sua sponte* at the commencement of this action. The parties agreed that the Court's duty was to make a review of the administrative record to see if the agency abused its discretion. Having framed the two issues for review, the Court allowed the Plaintiffs to present additional evidence. The parties did not discuss the scope of review issue during closing arguments.

 In the text of their final brief, Plaintiffs argue that the Court should undertake a *de novo* review and utilize a greater weight of the evidence test to determine if the agency acted properly. However, in the conclusion of their brief and in the complaint itself Plaintiffs urge

the Court to find that the Defendants abused their discretion. The abuse of discretion standard would be the standard utilized for a review on the record; it would not be the applicable standard for a *de novo* review.[10]

Defendants do not state in their final brief what the scope of review should be. Given Defendants' articulation that the standard to be applied is "abuse of discretion" and their arguments to this Court, they advocate a review on the record.

Several courts have addressed the issue of the scope of review in a § 1464(d)(6)(A) proceeding. While this Court is not examining this issue on a clean slate, it is apparent that the writing already committed to slate is contradictory. *Compare Fidelity Savings,* 540 F.Supp. at 1378 *with Telegraph Savings,* 564 F.Supp. 862 at 869–70 (N.D.Ill.1981) *and Washington Federal,* 526 F.Supp. at 350–354. At least one court which advocated a review on the record struggled with the problem of obtaining a complete record for judicial review. *Washington Federal,* 526 F.Supp. at 350–354.[11]

The problems with assembling a complete administrative record for review are occasioned in great part by the organizational

---

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
(1) compel agency action unlawfully withheld or unreasonably delayed; and
(2) hold unlawful and set aside agency action, findings, and conclusions found to be—
(B) contrary to constitutional right, power, privilege, or immunity;

**10.** The consideration the Court must employ when applying the standard outlines in § 706(2)(A) is 1) whether the agency considered the relevant factors; 2) whether the action has a rational basis in the facts of record, and 3) whether the agency has demonstrated a lateral connection between the facts found and the choice made. *Wawszkiewicz v. Department of Treasury,* 670 F.2d 296, 301 (D.C.Cir.1981). It is clear that the Court may not substitute its judgment for the judgment of the agency absent such abuse. The Court, however, will take leave to obtain more evidence if it appears that the agency action,

though rationally based on the record before it, relied on clearly erroneous facts.

In a *de novo* review the agency determination is "wiped clean" and the Court makes its own independent judgment. *See Washington Federal,* 526 F.Supp. at 350 n. 2.

**11.** Contrary to Plaintiffs' assertion in its final brief, the court in *Washington Federal* did not conduct a *de novo* trial. The court explicitly rejected the idea and stated:

In this court's memorandum and order of December 18, 1980, in construing the statutory language, the court held:
The right to prosecute this action enables the association to develop all of the facts that bear upon the merits of the issue to be decided by the courts. It is in this sense then that the statute states, "The court shall upon the merits dismiss such action or direct the board to remove such conservator or receiver." Given this purpose, "upon the merits" is not subject to the construction that it grants a trial *de novo* with the "opinion" of the Board wiped clean.

*Washington Federal,* 526 F.Supp. at 526 n. 2. *See supra,* note 4.

structure of the FHLBB. Under the organizational scheme, the Chairman assumes a dual role in considering matters involved in the present action. He acts in a quasi-judicial role with the two other Board members in deciding how to interpret agency policy and regulations, when to invoke the FHLBB authority to appoint a receiver, and whether a particular proposal should be accepted in light of agency policy.

In his other role, the Chairman effectively acts as the Chief Executive Officer. He guides and advises the staff during its negotiations with a particular association prior to the submission of a proposal to the full Board for consideration. It was the performance in these dual roles by Chairman Pratt that is the crux of Plaintiffs' case.

Plaintiffs argued that in guiding the staff, the Chairman received information upon which he ultimately decided the fate of KB's proposals and of Biscayne. It is clear from the testimony in this case that Chairman Pratt, generally considered a forceful Chairman, conferred on a number of occasions with the senior staff regarding KB's proposals and Biscayne's situation. The contents of these conversations were not included in the administrative record originally offered to the Court by the Defendants on April 6.

On inquiry from the Court, the Defendants agreed on several occasions that all information given to the Board concerning the Biscayne situation should be considered the basis for the Board's decisions. Defendants agreed that the contents of the conversations should be included in the record.

The Court considered how to obtain the contents of these discussions. Plaintiffs noticed the depositions of FHLBB staff members as well as members of the Board. Defendants moved for a protective order as to the Board members. The Court initially allowed only the depositions of the staff members. Plaintiffs were allowed to inquire into the history of the negotiations between the parties and into what they communicated to the Board members.

The Court allowed Plaintiffs to depose the Board members and inquire as to what the staff communicated to them when it became evident that senior staff members had held several important conversations with Pratt concerning this matter.[12]

Sentient that the mental processes of the decision makers is above inquiry, the Court felt that Plaintiffs should be given an opportunity to substantiate their claims that the Board and staff had been involved in the worst form of double-dealing and outrageous behavior. *But see United States v. Morgan,* 304 U.S. 1, 18, 58 S.Ct. 773, 776, 82 L.Ed. 1129 (1938), 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941); *Davis v. Braswell Motor Freight Lines,* 363 F.2d 600, 604–605 (5th Cir.1966). Since there exists no articulated Board policy or rules concerning what kind of proposals are approved by the Board or when a receiver will be appointed, the only way for the Plaintiffs to compare what the staff represented to them as being Board policy and what in fact was Board policy was to depose the Board members. Plaintiffs withdrew their notice of Chairman Pratt's deposition when Defendants announced that he would testify at trial.

The Court notes that the District Judge in *Washington Federal* allowed the Plaintiffs to submit testimony refuting statements made by staff members at the Board

---

**12.** Having confronted the obstacles attendant to securing a complete administrative record and given the structure of the FHLBB, the Court queries whether a complete record can ever be assembled in a § 1464(d)(6)(A) action. For this reason and for those outlined by Judge Grady in *Telegraph Savings,* the Court believes that a strong argument can be made for a trial *de novo* under the statute. Judge Grady based his opinion on "the structure of the statute, the legislative history and by the strictures of due process." *Telegraph Savings,* 564 F.Supp. at

869–70 (N.D.Ill.1981). The question remains, however, whether Judge Grady's holding can be reconciled with the holdings in *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) and *Camp, Controller of the Currency v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973) ("[D]e novo review is appropriate only where there are adequate fact-finding procedures in an adjudicatory proceeding or where judicial proceedings are brought to enforce certain administrative actions.")

meetings and allowed Plaintiffs to inquire of staff members as to what they communicated to the Board members at the briefing sessions and to the contents of the communications. *Washington Federal*, 526 F.Supp. at 350–352, 354. In essence, the court expanded the initial record and supplemented it with live testimony concerning the communications and the factual underpinnings of the Board's decision.

Regardless of how the scope of review is characterized in *Washington Federal* or in the present case, the procedures followed are similar. Defendants assumed the initial burden of producing the record which included depositions of staff and Board members. Plaintiffs presented their witnesses and Defendants presented witnesses to rebut Plaintiffs' claims. Both of the parties had the chance to examine all of the significant players in the negotiating and decision-making process.[13]

Having considered all of the evidence, the Court does not feel that the issue of the proper standard of review need be reached. Under either the greater weight of the evidence standard or the abuse of discretion as to at least Count II, Plaintiffs must prevail.

## THE PARTIES

Defendant Federal Home Loan Bank Board (FHLBB) is a federal agency organized pursuant to the Federal Home Loan Bank Act, 12 U.S.C. §§ 1422 *et seq.* The agency has supervisory authority over federally chartered savings and loan associations pursuant to the Home Owners' Loan Act of 1933, 12 U.S.C. §§ 1461 *et seq.* The adoption of final resolutions by the FHLBB is accomplished by the vote of the three Board members. The members of the Board at the time the FHLBB adopted the two resolutions being attacked by Plaintiffs were Richard T. Pratt (Pratt), Edwin J. Gray (Gray) and Jamie Jackson (Jackson). Pratt served as Chairman of the FHLBB.

Defendant Federal Savings and Loan Insurance Corporation (FSLIC) is a federal agency organized pursuant to Title IV of the National Housing Act, as amended, 12 U.S.C. §§ 1724–1730f. FSLIC insures the accounts of eligible state savings and loan

---

**13.** Plaintiffs complain that irregularities in the tapes of the March 17 and April 16 Board meetings prevented them from getting a complete administrative record. The gravamen of Plaintiffs' complaint is that there are eight (8) points in the March 17 tape where the machine was stopped and started. Also, a voice on the tape announces that the meeting commenced at 4:30 P.M. while the transcript reflects that the meeting started at 5:58 P.M. The evidence reflects that the tape was not erased and that at 4:30 P.M., the Board decided to conduct a closed, unrecorded briefing session. Through depositions and live testimony, the Plaintiffs were able to elicit what was said at the meeting. They were also furnished as part of the administrative record, a transcript of the recorded portion of the meeting on that day. The Court finds no merit to Plaintiffs' protestations concerning the March 17 tape.

As for the April 6, meeting, Plaintiffs allege that four seconds had been erased from all four tracks of the tape. Approximately 33 to 36 seconds have been erased from tracks three and four. Tracks three and four record only some of the background noise and an occasional comment. Plaintiffs were given a complete transcript of the entire meeting including the contents of the 4 second gap.

The Court is somewhat troubled by the alleged irregularities in the April 6 tape in light of

Plaintiffs' expert testimony that given the nature of four track tape, the erasures could only occur by playing the tape backwards. Defendants did not offer an explanation to the Court as to how such erasures could have happened unintentionally. One of Defendants' witnesses testified that one of the other staff members had told him that "he could have perhaps inadvertently erased some of the tape."

The Court's opinion is that the Plaintiffs' protests concerning the April 6 tape are without merit. Plaintiffs had had a chance to develop as complete a record as possible. The Court finds no reason to believe that the contents of the four second gap which was transcribed before the erasure was made are not true and accurate. Furthermore, at that point in the meeting, the conversation concerned the suspension of trading of Biscayne's stock on the New York Stock Exchange; the Court does not believe that this topic is germane to the issues at hand.

The purpose of the transcript is to record the main conversation being conducted by the Chairman; it is not designed to include all of the side comments which may occur periodically during the course of the meeting. A transcript is not required to read like a conductor's musical score; the transcript records the melody, not the sub harmonies.

associations, various savings banks and all federal savings and loan associations. 12 U.S.C. §§ 1724–1730f. FSLIC operates under the direction of the FHLBB. 12 U.S.C. § 1725(a); 12 U.S.C. § 1437(b); Reorganization Plan No. 3 of 1947. When the FHLBB appoints a receiver for a federally chartered savings and loan association, it must appoint FSLIC. 12 U.S.C. §§ 1462, and 1464(d)(6)(D).

Plaintiff Biscayne Federal Savings and Loan Association (Biscayne) which operated 34 branches in South Florida was organized in 1956 and chartered that same year by the FHLBB. Its charter expressly provided that it was subject to "all lawful and applicable rules, regulations, and orders of the Federal Home Loan Bank Board." By virtue of its status as a federally chartered association, Biscayne has enjoyed the benefits of FSLIC insurance since its inception in 1956. In 1976 Biscayne converted from a mutual to a stock association with the FHLBB approval.

In 1980 Biscayne's management defeated a takeover bid by Empire Gas Corporation by persuading Plaintiff Kaufman and Broad, Inc. (KB) to acquire control of Biscayne; KB acted as a "white knight" in the parlance of corporate acquisition litigators. KB purchased approximately 25% of Biscayne's outstanding stock. As part of its agreement with Biscayne, KB also acquired a seven-year option to tender for any and all of the remaining shares of Biscayne stock.

The FHLBB approved KB's acquisition of a controlling interest in Biscayne pursuant to FHLBB Board Resolution No. 80–673. The FHLBB placed several conditions on the acquisition. Plaintiffs do not challenge the authority of the FHLBB to impose

those conditions; Plaintiffs do not deny that they are bound by the conditions therein imposed. Two of the conditions state, in essence, that KB will maintain Biscayne's net worth at no less than the minimum regulatory level from the time it acquires 50% or more of Biscayne's stock, and that Biscayne may not pay dividends in any particular year in excess of 50% of Biscayne's net income.

Plaintiff Kaufman and Broad is a publicly traded corporation based in Los Angeles and founded in 1957 with interests in various businesses including home building, insurance and mortgage banking. Mr. Eli Broad is its founder, President and majority stockholder. KB has consolidated assets in excess of $1 billion and total capital of $270 million. Since 1980, KB has owned approximately 25% of Biscayne's outstanding stock of approximately 1.9 million shares and is Biscayne's largest shareholder.[14]

Mr. H. Brent Beesley (Beesley) was at all times relevant hereto the director of the Office of FSLIC at the Bank Board. Mr. Thomas P. Vartanian (Vartanian) was at all times relevant hereto General Counsel to the Bank Board and director of the Office of General Counsel (OGC). Mr. D. James Croft (Croft) is director of the Office of Examinations and Supervision (OES) at the Bank Board.[15]

Defendants Stanley Warranch, Charles I. Babcock, Jr., Kenneth Kamberg, R. Bruce Ricks and Ray M. Shaw are the directors of New Biscayne and were joined by this Court's Order for purposes of placing them on notice of the Court's decree issued pursuant to the All Writs Act. *Biscayne Federal Savings and Loan Association, et al. v. Federal Home Loan Bank Board, et al.,* No.

---

**14.** In their motion to dismiss filed prior to the commencement of the trial, Defendants stated in a footnote that only "the association" had standing to bring an action pursuant to § 1464(d)(6)(A). Although Defendants noted their belief that KB was not a proper Co-plaintiff, they did not move for KB's dismissal. In the absence of a motion to dismiss and in light of the facts that the FHLBB chose to negotiate with representatives of KB throughout the sixteen (16) months and that KB remained in the case throughout this litigation, the Court need

not fully address the issue of KB's standing. *See generally, United States v. Students Challenging Regulatory Agency Procedures,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973).

**15.** The individual Defendants, Richard T. Pratt, Edwin J. Gray, Jamie Jackson, Thomas P. Vartanian, James D. Croft and H. Brant Beesley, are dismissed as to Counts I–V and only FHLBB and FSLIC shall remain as parties.

83–815–CIV–EPS (S.D.Fla. May 6, 1983, *nunc pro tunc,* April 29, 1983) ("Order on Matters Presented to the Court at Trial on April 29, 1983").[16]

## ECONOMIC OVERVIEW

The savings and loan industry operated at a profit for decades. Savings and loan associations (S & L's) accepted savers' deposits, paying interest at low rates which were fixed by the federal government. These deposits were then reinvested primarily in single family home mortgages. The long-term interest rates on these mortgages were slightly higher than the short-term interest rates paid to depositors, thereby allowing S & L's to realize a profit. By fixing the rate which could be paid to depositors, the government was able to indirectly control the interest rates charged by S & L's on home mortgages; this guaranteed the continued infusion of funds into America's housing industry.

The viability of this system was based upon the existence of stable interest rates. Since the income of any given S & L was essentially fixed based on its portfolio of long-term mortgages, its financial health was dependent on its ability to stabilize its costs, i.e., the interest paid to depositors. The ability to stabilize costs was easily achieved through the 1960's as the interest rate paid to depositors remained fixed by the government and competitive with market rates.

The popularity of money market funds and other liquid investments increased as interest rates rose in the late 1970's. Investors transferred money from S & L passbook accounts to money market funds. It became increasingly difficult for S & L's to extend new loans. S & L's looked elsewhere to find funds to support loans to which they had already been committed. They were forced to borrow these funds at high current market rates.

In seeking to assist the troubled S & L industry, Congress authorized S & L's as of July 1, 1978 to issue deposit instruments which paid interest at a level higher than the passbook rate. Interest on these six-month money market certificates was payable at a rate of ¼% above the rate on six-month U.S. Treasury securities.

The initial effect of money market certificates was positive as the interest rate being paid on these certificates remained lower than the rates of the S & L's combined investment portfolio. As the United States' economy began to experience a period of high and wildly gyrating interest rates, the effect of the certificates was less promising.

For most of the period from the beginning of 1981 to the middle of 1982, S & L depositors with low-paying passbook accounts transferred large amounts of their funds to S & L money market certificates. While S & L's were forced to pay these high rates to their depositors on the certificates, their source of income was the mortgage portfolio made up of long-term loans fixed at relatively low levels. S & L's with older portfolios containing mortgages executed long before the sudden rise in interest rates were hurt most severely since they received the lowest interest payments.

In 1981 and 1982, it is estimated that 85% of the S & L's were losing money. The S & L industry was suffering losses at dramatic rates. Plaintiffs' expert witness opined that from July 1981 to February 1983, on the basis of fair market value, there was "no question" that the entire S & L industry had no net worth. Chairman Pratt agreed that the negative net worth of the industry reached a low point of $50 to $150 billion in 1982 and termed this time as a "holocaust" for savings and loan institutions. Industry conditions created an unprecedented workload for the FHLBB in its effort to maintain supervision over many troubled institutions.

In late 1982 and 1983, interest rates again subsided dramatically. This had an immediate effect on the short-term profitability of the industry as more savings and loans began to realize a positive "spread". The

---

**16.** The nominal party defendants to this suit shall remain parties under the jurisdiction of this Court pending implementation of this Court's Final Judgment.

spread is the difference between the average return on their assets and the average cost of their deposits. More recently (February 1983), the industry as a whole has experienced an infusion of one billion dollars of new capital.

## BISCAYNE'S FINANCIAL CONDITION

During the 1980–81 fiscal year, Biscayne first began to experience a negative spread; its cost of borrowing money in the form of money market certificates, passbook accounts and other sources exceeded the return it realized from its loan and investment portfolio by .34%. During the 1981–82 fiscal year, the negative spread fell to –1.54%. This figure represented a loss in that single fiscal year of approximately $30 million.

Biscayne exhibited a negative annualized spread from at least June 1981 until December 1982. It regained a positive spread as of March 31, 1983; the spread was positive .64%. Plaintiffs' expert opined that absent a rise in interest rates, the positive spread should become larger. If interest rates were to rise, however, there is no indication that Biscayne would have been insulated from a further precipitous decline in net worth or that its spread would remain positive. From July 1981 through April 6, 1983, Biscayne's net worth steadily decreased.[17]

By the end of July 1982, Biscayne Federal registered a negative net worth on a book value basis of $–3.93 million. Its liabilities

exceeded its assets as reflected on the institution's balance sheet.

Biscayne's negative net worth continued to plummet. Between July 1, 1982 and February 28, 1983 Biscayne's net worth decreased approximately $3.5 million per month.[18] The parties do not dispute that by April 6, 1983 Biscayne had a book value negative net worth of approximately $30 million. Despite a positive net spread and the fact that the industry was continuing to show a recovery, Biscayne continued to lose money. Defendants projected that even if interest rates were to remain relatively lower than they had been in the 1982–83 period, Biscayne would not reach a positive net worth for another eight years and it would not become profitable for another three years.

Plaintiffs claim and Defendants do not dispute that Biscayne did not suffer from a liquidity crisis and that it had a present ability to meet depositor demand for funds and other obligations as they became due. Plaintiffs' expert as well as the report completed by Wertheim and Company for the Bidders' Package issued by the FHLBB after April 6, 1983, indicates that net worth is principally a book entry and not necessarily a true characterization of the daily operation of the institution, its ability to generate profits or its true financial condition.

Plaintiffs argue that the primary inquiry in assessing the financial condition of an institution is the liquidity of the institution. Plaintiffs, however, do not argue that insol-

---

**17.** Biscayne's book value net worth rounded to the nearest $10,000 from the end of July, 1981 to the end of March, 1983 was as follows:

| Month | Net Worth |
| --- | --- |
| July, 1981 | $ 31,850,000 |
| August, 1981 | 29,590,000 |
| September, 1981 | 26,550,000 |
| October, 1981 | 23,820,000 |
| November, 1981 | 20,570,000 |
| December, 1981 | 16,770,000 |
| January, 1982 | 11,780,000 |
| February, 1982 | 8,890,000 |
| March, 1982 | 8,310,000 |
| April, 1982 | 4,990,000 |
| May, 1982 | 900,000 |
| June, 1982 | 690,000 |
| July, 1982 | (3,933,520) |
| August, 1982 | (8,676,277) |

| Month | Net Worth |
| --- | --- |
| September, 1982 | $ (12,443,346) |
| October, 1982 | (16,813,043) |
| November, 1982 | (19,856,031) |
| December, 1982 | (22,496,612) |
| January, 1983 | (24,713,900) |
| February, 1983 | (27,387,061) |
| March, 1983 | (29,103,258) |

During this period, its borrowings in the form of "jumbo accounts", which carry a higher rate of interest increased over 250% from $188 million in July, 1982 to $504 million at the end of February, 1983.

**18.** *See supra,* note 17.

vency as it is used in 12 U.S.C. § 1464(d)(6)(A) means lack of liquidity. They agree that it refers to negative book value net worth.[19] They also concede that under this statutory scheme, Biscayne was approximately $30 million insolvent.

What is set forth hereafter chronicles a series of negotiations aimed at solving an inevitable problem of insolvency if no feasible solution could be arrived at. Biscayne, through KB and its principal stockholder Eli Broad, made every effort to save Biscayne from receivership while watching it go from $24 million in the black to $30 million in the red.

### THE FACTS

### BISCAYNE—POSITIVE NET WORTH 23.82 MILLION

On October 26, 1981, Ronald Kabot (Kabot), KB's Senior Vice President, wrote a memorandum to Eli Broad (Broad), KB's Chairman of the Board, Chief Executive Officer and largest shareholder. In this memorandum Kabot noted that, "Biscayne's net loss could easily approach $30 million for its fiscal year ending June 30, 1982". He suggested that KB sell its option to purchase outstanding shares of Biscayne while it was still worth something. He concluded: "I'm beginning to favor disposing of our option if the price gets us our money out. It would give us more flexibility to 'strike again' from a position of strength when FSLIC may even be more desperate than now."

### THE NEGOTIATION PROCESS: PHASE I

### BISCAYNE—POSITIVE NET WORTH 20.37 MILLION

In the late fall of 1981, one of KB's Washington, D.C. attorneys, George Christopher (Christopher), had lunch with Beesley, Director of FSLIC. Christopher enumerated Biscayne's problems to Beesley and talked "about the possibility of trying to put together some kind of a plan that would allow us to deal with these problems without having to go through the disruption inherent in a receivership involving a publicly traded company." Beesley told Christopher that he was "not particularly optimistic" about the possibility of saving the existing shareholders' interest in Biscayne. Beesley stated that he was willing to work with KB and its counsel to try to find a way to assist Biscayne with a view toward creating a model for dealing with other failed stock associations.

Broad and Kabot met with Beesley on a number of occasions starting on December 14, 1981 to discuss possible FSLIC assistance to Biscayne.

In preparation for the December 14, 1981 meeting, Kabot wrote a memorandum to Broad based on the earlier conversations between Christopher and Beesley. The memorandum stated, in pertinent part:

3. For purposes of review, I am listing below the key points from the Beasley [sic]/Christopher meeting(s) which I believe should affect our thinking most significantly in preparing our proposal to FSLIC:

(a) Beasley's [sic] two major conditions to do a deal:

(1) Some new hard $$ must be put into Biscayne by other than FSLIC and the 'old' capital must be subordinate to everything

(2) For FSLIC to agree to assistance, there must be new management

(b) Other Beasley [sic] concerns:

(1) Should FSLIC actually have to provide assistance, he wants to be repaid and be in a preferred or pari passu position

(2) Would like all shareholders to have the opportunity to participate in putting new capital into Biscayne . . .

(3) He wants to honor FSLIC's rule of not talking to outsiders without talking with management; he would like K & B to tell BFS [Biscayne Federal Savings]

---

19. *See Telegraph Savings,* 703 F.2d at 1028 (the 7th Circuit upheld District Court's finding that the use of book value to assess net worth employed by FHLBB complied with the mandate of 12 U.S.C. § 1464(d)(6)(A)(i).

management and Christopher agreed to this; ...

(c) Some other Beasley [sic] thoughts to consider:

(1) He wants *only* to assist Biscayne so it may survive and be salvaged vs our thought of making it a very strong Florida S & L able to absorb other weak ones

(2) He wants a model to use for a stock company

(3) He will shop any deal proposed with K & B ...

(4) He would prefer to do a deal with existing shareholders

(5) He would like to avoid a fight with a listed company

(6) He asked if $10 million was all that K & B was willing to contribute (in response to a Christopher comment)

(7) Thinks shareholders should contribute 1–2% of assets.

5. Time appears to be of the essence; in every conversation I've had with Christopher, he conveys a sense of urgency which he has been made to feel from Beasley [sic].

The December 14 meeting was attended by Beesley and several members from the FSLIC staff including Gene Hall and Bernard McKee. Christopher, Robert Wittie, a member of Christopher's law firm, Kabot, Broad and Don Kaplan, a financial analyst, represented KB.

The proposal presented by KB at the December 14 meeting provided that Biscayne would issue subordinated preferred stock and that FSLIC would infuse a quantity of money which would ultimately be repaid without interest. The proposal was modeled after what KB understood to be a recently accepted proposal by the FHLBB for another troubled savings and loan association.[20] KB's understanding of the other proposal was based on what it had read in the Wall Street Journal. Beesley rejected this proposal and stated emphatically that any FSLIC assistance would have to be repaid with interest. He stated that FSLIC was not going to make any more deals along the lines of the one referred to in the Wall Street Journal.

BISCAYNE—POSITIVE NET WORTH 16.77 MILLION

A second meeting was held in Washington on January 14, 1982, between Mr. Beesley and representatives of KB. The parties agreed upon a set of parameters acceptable to FSLIC for a new capital infusion proposal.

BISCAYNE—POSITIVE NET WORTH 11.78 MILLION

On February 2nd KB submitted a revised recapitalization proposal consistent with the agreed parameters. This involved a preferred stock offering, certain financial commitments by KB to assure that at least $10 million of preferred stock would be sold and a form of FSLIC aid known as "spread assistance."[21] The spread assistance would be repaid by Biscayne Federal with compounded interest. To support the feasibility of its proposal, KB engaged an economic consulting firm to perform financial simulations. The summaries of the simulations were forwarded to Beesley.

Kabot testified that at the February 4th meeting, Beesley told him that "the world has changed again" in view of deteriorating economic conditions within the industry, and FSLIC was no longer willing to provide the kind of assistance they had talked about in their earlier meetings. During the Feb-

---

**20.** KB's proposal was modeled after an agreement in which National Steel acquired Washington Federal Savings and Loan Association of Miami and Westside Federal Savings and Loan Association of New York. The evidence indicates that FSLIC provided spread assistance to National Steel. For a definition of "spread assistance" *see supra*, note 21.

**21.** Spread assistance · agreements by which FSLIC assures that the savings and loan will have a certain "spread" between its interest income on its mortgages, and its cost of funds. These agreements take many forms. Such an agreement might cover several years, and could provide declining amounts of assistance after the first year. Some agreements also provide that if the institution becomes more profitable than projected, then previous spread assistance would be repaid to FSLIC, though such repayments do not ordinarily require payment with interest.

ruary 4th meeting, Beesley suggested that KB submit a revised proposal utilizing a purchase accounting method and other "market-to-market" accounting techniques utilizing income capital certificates.[22]

On February 25, 1982 Biscayne issued a news release which stated in pertinent part:

Continuation of the Association's losses at current levels will exhaust the Association's net worth in the near future. Once the Association's net worth is exhausted, the FSLIC is likely to take action to protect depositors which could result in the total loss of stockholder capital investment in the institution. The FHLBB has recently expressed to the Association its concern with respect to the situation and has called the Association's attention to the FHLBB's power to act. . . .

Exhaustion of the Association's net worth can be averted only through a substantial capital infusion from private investors, which in all probability would need to be coupled with FSLIC assistance. Biscayne Federal is actively seeking such additional capital. However, there can be no assurance that third parties can be induced to make such substantial investment or that FSLIC would grant the required assistance and approve any proposed capital infusion or that such infusion would result in the preservation of existing shareholder capital investment.

In February 1982, the Bank Board staff proposed that Biscayne's Board adopt a resolution consenting to merging Biscayne with a strong association. Biscayne's Board of Directors was reluctant to adopt such a resolution due to, among other things, the disclosure requirements of the Securities Act of 1934. During March and early April 1982, officials at the Atlanta Federal Home Loan Bank informally "shopped"[23] Biscayne by making telephone inquiries of thirteen savings and loan associations to determine their interest in merging with Biscayne. None indicated an interest in a merger in the absence of substantial FSLIC assistance.

### BISCAYNE—POSITIVE NET WORTH 8.89 MILLION

On March 15, 1982, Broad and Kabot joined Beesley and his wife for dinner in Park City, Utah. At dinner, the parties discussed the outline of a recapitalization plan for Biscayne. On March 17th Broad wrote a letter to Beesley setting forth the outline of a proposal which he characterized as "our mutual general understandings." He stated in part:

We agreed that our general understanding is subject to you and your staff's review of the "numbers" and a satisfactory definitive agreement. We are pleased that [FHLBB] Chairman Pratt is in conceptual agreement.

Under the Park City formula, as understood by Plaintiffs, new capital would be raised by means of a rights offering to existing shareholders. FSLIC would purchase sufficient income capital certificates

---

**22.** Purchase accounting techniques took advantage of certain idiosyncracies in Generally Accepted Accounting Principles ("GAAP") and the Bank Board's own Regulatory Accounting Principles ("RAP") to produce an accounting, or paper, gain without substantial change in the underlying economics of the institutions involved.

ICC's or Income Capital Certificates are securities created by the FHLBB and issued to FSLIC by an association in exchange for cash or FSLIC notes. ICCs have the attributes of both equity and debt. They are akin to long-term notes. However, they are repayable in principal and interest only out of earnings. Since interest is not compounded, FSLIC loses money on the deferral on the payment of the interest.

**23.** "Shopping" involves the solicitation of bids by the FSLIC from financial institutions who

may be interested in acquiring, often with the aid of FSLIC assistance, a failed or failing association. The Board utilizes several types of shopping. Formal shopping entails the convening of a bidder's convention at which interested parties receive a briefing by the FHLBB as to the condition of the institution being shopped. The Board appears to utilize formal shopping either before or after a receiver is appointed depending on the circumstances of the particular institution. Informal shopping includes conversations between FHLBB and individual parties who the FHLBB believes to be interested in the troubled institution. In informal shopping, the FHLBB does not make a presentation to all interested parties at one time and a bidder's package is not prepared.

(ICC's) for three years for Biscayne Federal to have a net worth equal to its required minimum net worth plus an amount representing Biscayne Federal's estimated losses for the 12 months following the closing of the transaction.[24]

In accordance with Beesley's wishes, as expressed in the parties' earlier discussions, the transaction would be accounted for using purchase accounting. Since the ICC's would have had to be repaid upon Biscayne's achievement of a specified level of income, the FSLIC assistance under the Park City proposal was considered to be repayable assistance.

Beesley believed that the recapitalization proposal outlined in Broad's March 17th letter did not conform to what was discussed at the Park City dinner meeting. He testified that he was "totally taken back" by Broad's reference to Chairman Pratt since "to my knowledge that was never discussed and certainly I don't believe that Chairman Pratt had any idea *at that point in time* what the discussions were." (Emphasis added). Kabot testified that Beesley stated that he thought the proposal "would be acceptable". As to that matter, there was no indication that Beesley represented that Pratt would agree to the proposal or that Beesley was authorized to say that the Board would adopt it. He did not, however, write a letter to Broad to correct Broad's misunderstanding. Beesley explained that he received scores of letters each day and generally delegated responsibility for replies to his subordinates. Beesley orally advised representatives of KB of the misunderstanding sometime prior to April 8th but not before KB and Board staff members had spent a significant amount of time working on the details of the proposed transaction and after KB had incurred expenses to retain investment banking advisors.

## BISCAYNE—POSITIVE NET WORTH 8.31 MILLION

On April 19, 1982, Broad, Kabot and Wittie met with Beesley, Vartanian and Hall to discuss the Biscayne recapitalization proposal. Vartanian's contemporaneous notes record that Broad stated during the meeting that "*I understand FSLIC is not here to give money away to stockholders.*" (Emphasis added). KB's attorneys were directed by the Bank Board staff to modify the documents to provide for a formula basis for the infusion of new shareholder capital and the income capital certificates. On April 21, Kabot wrote a letter to Albert Pallot, Biscayne's founder and then Board Chairman and Chief Executive Officer, in which he summarized the April 19 meeting. He stated that KB had no assurance that FSLIC would accept the proposal because FSLIC "anticipates receiving at least two other proposals from other parties and that FSLIC must proceed to enter into the arrangement that is the most cost effective to the FSLIC fund."

## BISCAYNE—POSITIVE NET WORTH 4.99 MILLION

By early May 1982, attorneys for KB and FSLIC had incorporated the KB proposal into a draft that contemplated purchase of Income Capital Certificates (ICC's) by FSLIC from Biscayne. KB believed that the negotiations had been completed. However, the FHLBB staff sent the draft agreements to outside legal counsel for a general review. The outside counsel retained the investment banking firm of Lehman Brothers to assist in the evaluation. Counsel reported on May 18 that the proposed agreement raised "substantial fairness questions and reporting concerns regarding Biscayne's common stockholders" as well as "the substantial prospect of 'strike' or injunctive litigation which could stop this deal before it is ever consummated."

In late May 1982, Kabot, Christopher and Wittie met with Beesley and members of his staff. After stating that he had conceptual problems regarding the KB proposal, Beesley was persuaded by Kabot to proceed with the drafting of the proposal. Beesley added that his staff would assume responsi-

---

**24.** For a definition of ICC's, *see supra,* note 17.

bility for redrafting the proposal and incorporating FSLIC's concerns.

## BISCAYNE—POSITIVE NET WORTH 0.90 MILLION

The staff attorneys delivered a revised draft to Wittie on June 4. On June 15 Christopher and Wittie responded in a lengthy letter wherein they complained that the staff's redraft gave FSLIC increased control over Biscayne and made FSLIC's capital infusion conditional. Counsel specified item-by-item their criticisms of the staff's redraft.

## BISCAYNE—POSITIVE NET WORTH 0.69 MILLION

On July 2, 1982 FHLBB attorney Hal Levi sent to Wittie a letter stating that redrafts of the proposed agreements containing "a number of accommodations made as a result of your letter and our meetings" had been sent to KB's counsel the previous day. Levi also stated that Biscayne's deteriorating financial condition made it imperative that KB respond as soon as possible to determine whether the transaction would be consummated. Plaintiffs did not tender a redraft to Levi.

On July 12 Biscayne announced that it had entered into an agreement in principle with City Federal Savings and Loan Association of Elizabeth, New Jersey to sell City Federal six of its thirty-four branches. Biscayne further claimed that it would recognize a $38 million gain from the transaction.

On July 15, Broad, Kabot, Christopher and Wittie met with Beesley, Hall, Levi and Bernie McKee (McKee) to discuss the recapitalization proposal. The parties could not reach an agreement; they agreed, however, that the proposed branch sale to City Federal would generate the required capital. The parties agreed to hold the original proposal in abeyance. There was no further activity with respect to KB's first proposal after the middle of July 1982.

In their closing arguments, Plaintiffs stated that they did not ascribe any wrongdoing to the FHLBB for their conduct during this first phase of negotiations.

## THE NEGOTIATION PROCESS: PHASE II

### BISCAYNE—ZERO NET WORTH

After the July 15 meeting, the parties turned their attention to KB's new proposal based on the branch sale. Before KB began negotiations with the FHLBB concerning the branch sale proposal involving City Federal Savings & Loan Association, KB rescinded the proposal and presented another branch sale proposal. The new proposal entered into in principle on August 9 involved Biscayne and California Federal Savings and Loan Association (Cal Fed).

### BISCAYNE—NEGATIVE NET WORTH— 3.93 MILLION

The Biscayne/Cal Fed agreement provided that: (a) Cal Fed would pay Biscayne approximately $1.7 million for the assets of the eight branches; (b) Cal Fed would assume responsibility for payment of principal and interest on the deposits at those branches; and (c) Biscayne would give Cal Fed a mortgage-backed bond in consideration for its agreement to assume those deposits. The amount of the bond was to be determined by multiplying the amount of liabilities assumed by .8634146. The bond was to carry a fixed interest rate calculated by increasing the average aggregate cost of the deposits assumed by Cal Fed on the date the deal was consummated by 5%. Had the transaction been consummated on August 9, 1982—the date of the Cal Fed/Biscayne agreement—Cal Fed would have assumed $410 million in deposits, which then had an average aggregate cost of 12.8%, in exchange for a mortgage-backed bond issued by Biscayne in the amount of $354 million ($410 million × .8634 = about $354 million) carrying a fixed interest rate of 17.8% (12.8% + 5% = 17.8%). The agreement gave Biscayne the right to prepay the bond at any time but imposed a 20% call premium if the bond were prepaid at any time within the first ten years. The bond could be prepaid as mortgages backing it were prepaid.

Had the transaction been consummated on August 9, 1982, Biscayne would have had to pay Cal Fed $63 million in interest ($354 million × 17.8%) in exchange for Cal Fed's assumption of the obligation to pay about $52.5 million interest on the deposits it assumed ($410 million × 12.8%). Biscayne's net annual payout to Cal Fed would have been approximately $10.5 million ($63 million – $52.5 million). While consummation of the transaction would have saved Biscayne the cost of operating the eight branches (approximately $3.7 million per year), Biscayne would still have had to make a net annual payout to Cal Fed over the life of the bond; $6.8 million would have been paid during the first year alone assuming interest rates remained at August 1982 levels. If interest rates and the corresponding cost of the deposits decreased, the amount of Biscayne's net annual payout to Cal Fed would increase accordingly. Biscayne's net annual payout would have been less if, as Kabot asserted, a substantial portion of the underlying mortgages were prepaid.

Biscayne's management, *on Beesley's earlier suggestion to utilize purchase accounting techniques,* sought to account for the transaction by recording a paper profit of $56 million which would thereby restore facially the association's balance sheet to a positive net worth position. Biscayne's management proposed to: (a) account for the branch sale transaction as if it had occurred on August 9, 1982, the date of its agreement with Cal Fed; (b) record the transaction as the exchange of a $410 million liability—the deposits in the eight branches—for a $354 million liability—the mortgage-backed bond; and (c) thereby record an instantaneous decrease in its liabilities of $56 million with a resultant instantaneous increase in its net worth of $56 million.

Plaintiffs argue that by booking a $56 million profit, Biscayne would have been free to implement its new business plan. As part of its plan, Biscayne proposed to engage in mortgage banking which involved the sale of mortgages to investors at a profit while retaining the mortgage servicing rights. Part of this plan was to aggressively seek to refinance the mortgages underlying the bond to Cal Fed. Plaintiffs assert that Biscayne had experienced considerable success refinancing mortgages with the Fannie Mae Program. If interest rates were to drop, a rise in housing sales could be expected bringing about greater prepayment of the underlying mortgages. Plaintiffs' scenario had projected a complete prepayment of the principal balance on the mortgage-backed bond within five years.

## BISCAYNE—NEGATIVE NET WORTH—8.68 MILLION

Effective September 1, 1982, Kabot replaced Pallot as Chairman of the Board and Chief Executive Officer of Biscayne. KB's representation on the ten member Biscayne Board of Directors increased to six.

On September 14, 1982, Cal Fed filed an application with the FHLBB's designated supervisory Agent at the Federal Home Loan Bank of San Francisco for approval of the branch sale transaction. The Supervisory Agent sent the application to the FHLBB's Office of Examinations and Supervision (OES) for action pursuant to an OES directive that all Federal Home Loan Bank inter-district branch sale transactions be sent to Washington for final approval. The Washington office wanted to examine the effect of the transaction on both the purchaser and the seller. The Cal Fed/Biscayne transaction was the first interdistrict branch sale to be examined by OES.

A copy of Cal Fed's application was sent to Robert Cohrs, the Supervisory Agent at the Federal Home Loan Bank of Atlanta who had primary responsibility for Biscayne. On September 22, 1982, Cohrs sent a letter to George Murphy, a Washington lawyer whose firm represented both Cal Fed and Biscayne in the transaction, requesting certain information. Mr. Cohrs stated:

Due to the financial condition of Biscayne Federal, this application is being submitted to the Federal Home Loan Bank Board for consideration. Accordingly, we

must have sufficient documentation to determine that the sale is in the best interests of Biscayne Federal and the Federal Savings and Loan Insurance Corporation.

We are continuing to review the application from Biscayne Federal's point of view and will advise you if any additional information is deemed necessary.

## BISCAYNE—NEGATIVE NET WORTH—12.44 MILLION

■ Biscayne filed an application to issue securities on October 7 with the Atlanta office of the FHLBB. On October 14 Mr. Cohrs disapproved Biscayne's application.[25] Biscayne's application to issue the mortgage-backed bond went to OES in Washington for reconsideration and final disposition.

By October, the OES staff had identified five basic concerns with the branch sale proposal:

(1) whether Biscayne was disposing of its best branches;

(2) whether it was proper to account for the transaction as if it had been consummated on August 9;

(3) whether the 17.8% interest rate was a fair market value as of August 9;

(4) since the transaction constituted, in substance, a loan of $354 million from Cal Fed to Biscayne, and since a loan of that size violated the loans-to-one-borrower restriction in 12 C.F.R. § 563.9–3, whether Cal Fed's compliance with that regulation should be waived in order to permit it to consummate the transaction;

(5) whether the transaction would insure the long-term viability of Biscayne.

On October 15, Atlanta supervisory Agent Cohrs sent a memorandum to Mark Rundle, an OES Regional Director whose region encompasses Florida, recommending against the branch sale. Cohrs' recommendation was based in large part on what he felt was an unrealistic accounting method for the rate for the mortgage-backed note proposed by Biscayne; the very method that Beesley had earlier suggested could be employed. While acknowledging the reports submitted by Shearson/American Express and Deloitte, Haskins & Sells by Biscayne in support of the fairness of the proposed transaction and the proposed accounting methods, Cohrs believed that the accounting treatment and the rate advocated by the others did not realistically reflect Biscayne's financial condition. Although Cohrs voiced such an objection, no effort was made at that time to secure advice from an outside source to evaluate the reports submitted.

Kabot, acting as Chairman and Chief Executive Officer of Biscayne, and other Biscayne representatives, met with Croft and his staff on October 28 to discuss the proposed Cal Fed branch sale and OES concerns. After that meeting the staff resolved concern (1) by concluding that Biscayne was not disposing of its best branches. The staff felt that concern (4)—the loans-to-one-borrower restriction—would not be a problem if the other concerns could be resolved. Concerns (2), (3) and (5) some-

---

**25.** Plaintiff contends that Cohrs had no authority to examine, recommend or reject the proposal. Plaintiffs contend that "At the time Biscayne and Cal Fed signed the branch sale agreement, the only regulatory prerequisite was a requirement that the acquiring institution—Cal Fed—submit an application for approval to acquire additional accounts of an insurable type."

"Any scrutiny of the seller's (Biscayne's) side of the transaction was 'solely to ascertain whether the buying institution [in this case Cal Fed] must file an application to increase its accounts of an insurable type'."

Defendants contend that Cohrs' examination of the proposal was made pursuant to C.F.R.

§ 563.8(e), which pertains to "Issuance of Subordinated Debt Securities." Defendants argue that under § 563.8(e) Cohrs acted properly in reviewing the application and in transmitting it to the FHLBB in Washington, D.C.

The Court finds that § 563.8(e) was the governing statute and that Cohrs' actions were in accordance with the statute. The Court finds no merit in Plaintiff's claim that under § 563.-8(e) Cohrs only had the right to review the application rather than recommend or dispute it. Given the Court's reading of the statute and the fact that this was the first interdistrict bank sale proposal, the Court believes that the FHLBB's actions in this regard were proper.

what interrelated, remained open; viz., the date and rate of the transaction and the viability of the institution. As will be noted *infra,* Biscayne conceded that concerns (2) and (3) and also the basis for the claim of viability (McGuirk Report) proved to be totally erroneous.

## BISCAYNE—NEGATIVE NET WORTH—16.81 MILLION

On November 5, T.F. Sharkey, the FHLBB supervisory agent in San Francisco, recommended approval of the branch sale transaction based on his review of the effect on Cal Fed.

On November 9, Croft called Kabot. He told Kabot that if the branch sale application were to go before the Board at that time, he would recommend against it. Kabot requested an opportunity to present additional information in support of the application before Croft made his recommendation.

## BISCAYNE—NEGATIVE NET WORTH—19.86 MILLION

On December 10, Biscayne provided the FHLBB a concurring opinion from Merrill Lynch that 17.8% was a fair market price for the bond. OES staff accountants questioned whether the 17.8% rate was a fair market rate as of August 9. They also took the position that under Generally Accepted Accounting Principles (GAAP) the transaction should be accounted for as of the date it was consummated, not the August 9 agreement date. OES retained First Boston Corporation to assist it in evaluating the proposed transaction. On December 22, First Boston opined (a) that as of August 9, 1982 the fair market interest rate on the proposed $354 million mortgage-backed bond would range between 17.25% and 17.75%; (b) that the 17.8% rate was "close enough to this range to qualify as an appropriate rate"; and (c) that as of December 21, 1982, the appropriate interest rate on the proposed mortgage-backed bond would be 13.73% to 14.23%. OES staff accountants concluded that the transaction should be accounted for as of the date it was consummated and, therefore, Biscayne's

accounting gain should be no greater than $23.5 million.

Plaintiffs complain that the FHLBB was dilatory in requesting First Boston to render an opinion two and one-half months after the Cal Fed application was submitted. They state that the request should not have been made since Biscayne had already submitted an opinion from Shearson/American Express. To the extent that these allegations might relate to Plaintiffs' count alleging violation of equal protection, they will be subsumed in the Court's treatment of that count. Although the Court believes that the FHLBB cannot be chastised for being prudent, the delay precipitated by these actions further placed Biscayne at the mercy of the FHLBB.

As for the viability issue, Biscayne's ten-year forecast showed that it would realize a total gain of $96.4 million. Croft instead asked the Qualitative Analysis Division (QAD) of the Office of FSLIC to run its own ten-year forecast using the standard FSLIC interest rate scenario. It should be noted that this procedure by itself was irregular. QAD was not under the supervision of Croft. There is no evidence that Croft had ever before used this division to assist him in his duties and responsibilities. Croft never questioned the results of QAD's analysis nor was an attempt made to understand KB's projections; no effort was made to determine why QAD's results differed so radically from those of Biscayne; even after KB requested a meeting for that purpose.

On December 29 Edward McGuirk, Director of QAD, reported to Croft the results of QAD's projections. The first forecast, which assumed no branch sale, showed Biscayne becoming profitable in the third year and regaining solvency in year eight. The second forecast, which assumed the occurrence of the branch sale, showed Biscayne regaining solvency immediately (by virtue of the recognition of a $56 million accounting gain) but returning to insolvency in the second year, and remaining insolvent beyond year ten. McGuirk's third forecast, which assumed consummation of the branch sale, recognition of a $56 million accounting

gain and implementation of Biscayne's business plan, showed Biscayne immediately returning to solvency but losing money throughout the ten-year period, returning to insolvency in the second year and ending the decade with $508 million negative net worth.

The QAD analysis was based, in McGuirk's own words, on a "clearly mistaken assumption" which yielded "meaningless results". It yielded devastating results to Biscayne because it formed the basis of the opinions of Croft and Beesley. Plaintiffs argue that QAD's incorrect analysis provided the basis for Croft's determination that the branch sale transaction would not result in Biscayne being a viable institution.

Plaintiffs allege and Defendants do not dispute that the unreliability of the Bank Board's projection is reflected in QAD's failure to comprehend the prepayment provisions of the mortgage-backed bond, as discussed above, and in QAD's failure to understand the mortgage backing business.[26] The Defendants do not seriously challenge Plaintiffs' assertion that Croft and Beesley relied, to a large extent, on the QAD analysis in determining that Biscayne would not be viable under the branch sale proposal. The evidence indicates that Beesley believed this as early as November 29.

On December 23, 1982, Croft was contacted by Bernard Carl, a lawyer representing KB. The purpose of the phone call was to threaten litigation if the branch sale proposal were turned down. Mr. Carl requested a further meeting with the staff.

BISCAYNE—NEGATIVE NET WORTH—22.50 MILLION

On January 5, 1983, a meeting was held to discuss the branch sale transaction. The meeting was attended by Croft, Beesley, Vartanian, Kabot and Carl. Other representatives for the Plaintiffs were also present.

There is some discrepancy as to what was said at the meeting though both parties agree that the discussion centered on improving the branch sale proposal so that it would be more acceptable to the staff. Croft indicated that the staff would "likely" recommend to the Board that it reject the transaction as it was presently structured. The parties agree that Croft indicated that in order to garner the staff recommendation, the deal would have to provide for an infusion of "hard" capital and the adoption of the accounting method preferred by the staff.

The facts indicate, and Plaintiffs do not dispute, that the Plaintiffs understood the nature of the accounting method advocated by the staff. There is no indication that the staff was obscuring this element of the criteria. As to the other criterion, the amount of capital to be infused, the parties differed slightly. The expressed concern of the staff based on the QAD analysis and the framework for the discussion was that Biscayne become viable. Croft's notes indicate that he stated that the staff was looking for the infusion of enough money to bring the net worth of Biscayne to 1% of its assets. One per cent represented approximately $18 million. Croft stated at trial that the one percent figure did not represent a certain goal but rather was a figure pulled from "out of the air" and it seemed to be in line with "emerging Board policy". Kabot's notes state that Croft in-

---

**26.** Plaintiffs allege that QAD made the following mistakes in its analyses:

(1) Biscayne was saddled with a cost of funds 75 basis points higher than the industry norm for analyses number one and two;
(2) He continued that practice for each of the ten years in his projections rather than assume that Biscayne would reach the industry norm as its business plan stated;
(3) QAB figured in a prepayment schedule of 15 years on the mortgages underlying the mortgage-backed bond, while FHA statistics show a 10 year prepayment schedule would be more appropriate, and Biscayne Federal projected they would be paid off in 5 years;
(4) QAD assumed that Biscayne Federal's portfolio yield would not change even though its business plan projected increased short-term, higher-yield lending;
(5) QAD's misunderstanding of the mortgage banking operation in QAD's assumption that Biscayne would have to borrow $360 million more to loan out $60 million under KB's proposed business plan.

dicated that the target figure was ½ to 1%, which amounts to $9–$18 million with the lower amount possibly requiring a "keep well" provision.

Kabot's notes also indicate that Beesley was concerned about the need to have a quick resolution of the Biscayne matter with Biscayne approaching $20 million in negative net worth. Beesley's desire for a "quick" resolution of the Biscayne matter belies the fact that the staff had spent an inordinate amount of time processing this proposal. From August 9, 1982 to January 5, 1983, Biscayne went from a mere $3.93 million negative net worth to the very substantial sum of $22.50 million negative net worth. Throughout this period of time, Biscayne did not seek one cent of FSLIC money as part of that proposal. Beesley also indicated that FSLIC would assist Biscayne if Biscayne met the minimum standards under the Garn-St. Germain bill.[27] Beesley also indicated that unless KB and Biscayne were willing to come up with a proposal designed to infuse hard capital into the institution, the FHLBB would solicit bids for Biscayne from prospective interested buyers. Kabot stated that KB would return on January 14 with a revised proposal which would attempt to meet the staff concern for capital infusion.

Kabot's notes of the January 5 meeting, embodied in a letter addressed to Broad, indicate that Plaintiffs had a general idea of what the staff concerns were at the January 5 meeting and how those concerns should be addressed by the Plaintiffs at the January 14 meeting.

Several staff members, including Vartanian, Croft and Beesley, briefed Chairman Pratt on January 10. The purpose of the briefing was twofold: to bring the Chairman up to date on the latest meeting with KB representatives and to secure some indication from Pratt as to what direction the staff should take in the negotiations with the Plaintiffs. Croft's notes indicate that Pratt believed that Plaintiff's accounting method was "outlandish" *but that he "would not object to the branch sale if it were a cash sale and/or if it were accounted for properly."* (Emphasis added). Apparently, Beesley neglected to inform Chairman Pratt that the "outlandish" accounting method was first suggested by Beesley. Croft's notes also indicate that he felt that if the branch sale were turned down, Biscayne would be required to publish this information. Pratt indicated that this would lead to the shareholders being "wiped out" by market forces rather than by the Board through the appointment of a receiver.

Plaintiffs believe that the last statement and the indication that Croft should contact Frank Dorer of the OES staff to have examiners ready to move into Biscayne on relatively short notice indicated that by early January "the defendants were focusing attention on ways to eliminate the shareholders' interest either by establishing a receiver or otherwise."

Although the Court believes that neither the notes of the briefing nor the circumstances surrounding the briefing necessarily indicate that the Defendants were acting out of a bad motive ascribed to them by Plaintiffs, it is again another link in the chain of circumstances that must be considered. The January 10 briefing did provide a chance for the staff to update the situation for Pratt and to find out whether they were negotiating under the proper assumptions. It is also, however, an example of the Chairman being called upon to function in his dual role of Board Chairman and Chief Executive Officer of FHLBB. As long as those roles do not become intertwined to the detriment of an institution being regulated by FHLBB, this Court has no concern. Congressional intent is being carried out. When, however, as in this case, information is not only communicated to the Chairman but he in turn gives directives to his staff to be relayed to the otherwise uninformed representatives of a

**27.** Under the Garn-St. Germain Depository Institutions Act of 1982, Pub.L. No. 97–320, 96 Stat. 1469 (1982), when an institution reaches certain net worth levels, the FHLBB is allowed to make loans to the institution through the issuance of ICCs.

failing institution, such words become the gospel of the Chairman of the Board and the institution's sole source of guidance.

A meeting was held on January 14 for the purpose of having KB present a revised proposal in accordance with the guidelines outlined at the January 5 meeting. Beesley, Croft and Hayes attended the meeting for the FHLBB while Broad, Kabot, Christopher and Wittie represented KB.

According to Croft's testimony, the meeting began with Broad wanting to know why the FHLBB approved another branch sale he had read about in the Wall Street Journal and not approved the proposed Biscayne sale. Croft said he was not aware of any such deal. Christopher, who had not been present at the January 5 meeting, stated that the staff had agreed at the January 5 meeting to recommend the branch sale if KB would infuse $9 million. Croft and Beesley informed him that he mischaracterized the staff statement. However, they did not explain how it had been mischaracterized. The staff did not state how KB might modify the proposal to meet the staff's concerns even though KB requested such information. One hundred and fifty-eight days had now elapsed and FHLBB still had Biscayne shadow boxing in its own lightless bank vault.

### THE NEGOTIATION PROCESS: PHASE III

Broad then presented an alternative to the branch sale proposal. The alternative proposal contained three elements: (1) KB would inject capital equivalent to 2% of its assets or approximately $38 million; (2) FSLIC would inject sufficient capital to bring Biscayne's net worth to zero or approximately $25 million *for which it would not be repaid* and (3) KB would sell to Biscayne certain housing and mortgage banking subsidies at fair market value which was estimated to be $220 million.

Beesley immediately objected to the third element. He felt that it was not an "arm's length" deal since some of the same people were on both sides of the transaction. He also felt that $220 million should not be

taken away from what he believed was a "failing institution." There was not the least implication to the Plaintiffs at that time or at any subsequent time prior to the branch sale proposal expiring on March 4, 1983, that nonrepayability was an issue in the negotiations. Beesley inquired as to whether KB would consider modifying its proposal to include only elements (1) and (2). After a brief caucus, KB stated that it would proceed under elements (1) and (2) and some form of element (3) which would not involve taking out any cash, imposing any liabilities or violating any rules.

Beesley stated that January 14 was intended to be "D-Day" and that he wanted a precise proposal within three days from KB. Beesley also stated that it was a "close call" as to whether elements (1) and (2) would "fly alone". Broad inquired whether KB could return with the branch sale proposal if the new alternative proposal were to fail. Beesley responded that KB should come back with both proposals within three days. Beesley stated that upon receiving KB's proposal, the staff would respond within three days.

On January 17, Christopher wrote a letter to Beesley and Croft which outlined KB's proposal. The bulk of the letter addressed itself principally to the new capital infusion proposal. Christopher also stated that it was prepared to meet the staff's criteria for supplementing the branch sale proposal.

Christopher started the letter by stating that KB would delete element (3) from the January 14 proposal as requested by Beesley. Christopher then outlined the modified proposal to include the following: Element (2) would remain the same; i.e., FSLIC would inject $25 million into Biscayne on a nonrepayable basis. Element (1), KB's injection of $38 million worth of capital, would be accomplished by having KB transfer its mortgage banking company, International Mortgage Company (IMC) to Biscayne. IMC was valued at approximately $18 million though the parties agreed to have it independently appraised. KB would inject, in cash, into Biscayne the difference between $38 million and the appraised val-

ue of IMC. Ten million dollars of the payment was to be made when the deal was consummated, and the remainder was to be paid at the end of one year.

Christopher's letter stated further that KB contemplated that if the Board considered and approved the matter at its next scheduled meeting and if KB could get shareholder approval at its upcoming meeting, the goal would be to sign the agreement within eight days of the date of the letter.

The next to last paragraph of the letter states in pertinent part that:

The above transaction has been proposed in lieu of the branch sale transaction because of its understanding that the branch sale transaction is not favored by the Bank Board staff.

The letter continues:

We understand, however, the Bank Board staff would be persuaded to recommend the branch transaction provided the gain is accounted for in a manner satisfactory to the staff and KB agrees to a capital infusion of $9 million. I have been further authorized to advise you that if the above $38,000,000 capital infusion plan is unsatisfactory, then KB is prepared to make the required infusion of $9 million in cash. We understand Biscayne would agree to an accounting of the transaction in a manner satisfactory to the Bank Board.

The following and last paragraph states: We are prepared to meet with you at your earliest convenience to discuss the above and to finalize agreements for a capital infusion program acceptable to you.

The facts indicate that Beesley met with Pratt at some point after receipt of the January 17 letter but before January 19. Beesley presented the January 17 infusion proposal to Pratt. According to Beesley and Pratt, Beesley expressed misgivings about the infusion of FSLIC monies on a nonrepayable basis to a stock-owned institution. Both expressed concern about the size of the failing institution, and commented on

how it would reflect on FHLBB if it failed. The Chairman wanted to get Biscayne's best deal to the Board for consideration and resolution. Although Beesley expressed reservations to the Chairman regarding the issue of nonrepayability, it is clear that Beesley never informed Pratt that he could not recommend a proposal containing that element. Pratt never indicated that he could not accept such an element as part of the proposal.

On January 19, the parties held another meeting. The meeting was attended by Beesley, Hall, Hayes and Christopher. At that time Gene Hall was Director of the Problem and Rehabilitative Division of FSLIC and reported directly to Beesley. Beesley commenced the meeting by saying that he had discussed Christopher's January 17 letter with Pratt.

Christopher, who did not testify at trial, stated in his deposition that Beesley then told him to tell Broad that "it's Christmas in January." Christopher also stated at deposition that Beesley said that he would recommend the proposal to the Bank Board.

Beesley recalls saying: "[T]he Chairman wants us to try to put some kind of an agreement involving these principles in writing and to hammer out the details and send it up for consideration." Beesley also stated that he did not tell Christopher that he would recommend against the proposal. Beesley further stated that he was "surprised that the Chairman was willing to go forward in terms of putting together a document which on its face appeared to have significant policy violations;" i.e., that Biscayne would not have to repay FSLIC for FSLIC's $25 million capital contribution.

Plaintiffs point to Hall's testimony in support of Christopher's assertion that Beesley stated that he would support the proposal. Plaintiffs stated on several occasions during the trial that Hall, although a defense witness, was completely credible and candid. Upon hearing Beesley's presentation, Hall stormed out of the room. Plaintiffs maintain that Hall reacted in response to Beesley's assertion or indication that Beesley would recommend the propos-

al. Having reviewed the transcript of Hall's deposition and his trial testimony, including the portions cited by the Plaintiffs, the Court finds that no other implication can be placed on Hall's conduct than that asserted by the Plaintiffs. Hall believed that Beesley said that he would recommend that the Board approve the proposal. Hall said that although he did not recollect very well what was said, he was upset that Beesley would present and Pratt would consider a plan calling for the nonrepayable contribution by FSLIC of $25 million.

Plaintiffs believe that the issue of whether or not Beesley and other staff members would recommend the proposal is vital because, as several witnesses have testified to, the Board very rarely, if ever, rejected the recommendation of the staff. While the Board has on occasion modified a staff recommendation which favored a particular matter, the Board has never, in the memory of all of the witnesses who testified, approved of a matter that the staff presented without a recommendation or with a negative recommendation. Plaintiffs believe that since Beesley told them that he would recommend a proposal, he was in effect telling them that it would be approved, particularly, since he had just come from a meeting with Pratt and had communicated this fact to the Plaintiffs. Plaintiffs believe that since Beesley later recommended against the proposal to the Board, he had misled the Plaintiffs at the January 19 meeting into believing that he supported the proposal. No different conclusion can be reached by this Court. Plaintiffs claim that what occurred from January 19 to April 6 was a charade because Beesley knew all along that he would not recommend the proposal and consequently, that the proposal would be turned down by the Board.

The Court feels that Christopher's impression that Beesley said that he would recommend the proposal was based on a reasonable interpretation of what Beesley stated. Hall believed that Beesley was favoring the proposal; he was surprised on March 17 when the staff directors would not recommend the proposal to the Board.

"Christmas in January" indicates that Pratt would entertain the proposal and that negotiations should proceed along the paths outlined.

Beesley testified that:

In January I had no idea what the Board's ultimate decision was going to be. I was opposed philosophically to that one point, and perhaps to other aspects of it. But in the broader picture, I think that deal had a realistic possibility of ultimately being approved.

Such testimony belies the Defendants' contention that the Plaintiffs were not misled. Beesley's testimony clearly indicates his absolute opposition to the nonrepayability feature of the proposal. He never communicated this opposition to the Plaintiffs. He was authorized by Chairman Pratt to communicate the fact that the proposal was presented to him and was not unacceptable on its face. The clear and unequivocal implication to the Plaintiffs was: forget the branch sale proposal; if the third proposal is otherwise acceptable, the nonrepayability feature will not be a problem for either the staff to recommend or for the Board to approve.

Christopher also indicated to the staff at the January 19 meeting that if the capital plan went forward, then the branch sale application would not be pursued and it would be withdrawn by the Plaintiffs.

The goal of the parties was to get the proposal to the Board for a vote by January 28.

After Beesley exited the meeting, the staff and KB personnel discussed the terms of the recapitalization proposal. Defendants assert and Plaintiffs do not rebut that Christopher introduced a change into element (1) of the proposal by stating that the $20 million in cash to be infused by KB would be given in exchange for interest bearing subordinated debentures to be issued by KB's insurance subsidy. Christopher also wanted to place a $25 million ceiling on KB's "keep well" provision.

A January 21 memorandum from Hayes to the three staff directors summarized the proposal as Beesley had outlined it and with the changes sought by Christopher. The staff opposed, *inter alia,* the use of subordinated debt. Hayes also stated that "from a conservative legal point of view" Biscayne should be shopped. On January 24, Vartanian noted his agreement with Hayes' position and also felt that the recapitalization proposal was "a terrible mistake". He believed that issuing ICC's would be better than having FSLIC give a nonrepayable contribution. *The memo also suggested that the staff not issue a letter to Christopher detailing the conditions in which a branch sale would be approved. Vartanian noted his concurrence with Hayes' suggestion. Hayes testified that this suggestion was based on the idea that the Board policy was still emerging.*

On January 21, KB's attorneys sent the bank staff a draft agreement which modified the nature of element (1). KB now proposed that KB and Biscayne could authorize KB to take back subordinated debt to cover all or any portion of its proposed $38 million infusion into Biscayne.

By this time Croft, who as head of the Office of Examinations and Supervision (OES) had primary responsibility for the processing of the branch sale proposal, laid aside the proposal. Croft testified that, having expressed his views at the January 5th meeting about the dubious possibility of the branch sale attaining staff approval, having attended the January 24 meeting and having read the January 17 letter from Christopher, he was under the impression that KB was interested in pursuing the recapitalization proposal. He understood that the branch sale was to be held in abeyance pending the processing of the recapitalization proposal. Croft testified that after January 14 he was only tangentially involved in the Biscayne case. There is no evidence indicating that he had any involvement with the recapitalization proposal at this time.

Plaintiffs suggest that the staff was stalling on the branch sale because the agreement on the branch sale between Cal Fed and Biscayne was due to expire on January 31, 1983. Plaintiffs allege that Defendants wanted the branch sale to die of its own expiration rather than have the Board reject it and face a lawsuit which had been threatened by Mr. Carl at the January 5 meeting. They cite Hayes' recommendation in his January 21 memorandum in which he specifically referred to the expiration date and opined that no guidelines be furnished to KB. The Court reaches the same conclusion. The staff's decision not to provide KB with guidelines for the branch sale after it had shifted its negotiating position from January 5 and the January 21 memo lead the Court to no plausible alternative explanations. The staff, particularly the staff directors, wanted the branch sale to expire without having to be accountable for its demise.

In a subsequent conversation in late January, Plaintiffs notified the staff that the expiration date for the branch sale had been extended to March 4. Plaintiffs indicated that the branch sale was to be held in abeyance; this was based on their mistaken assumption that Beesley was going to recommend the recapitalization proposal. At the end of February, Wittie called Rundle and stated that KB was interested in reviving the branch sale and having it go to the Board for resolution. Rundle did not convey the contents of the conversation to any of the staff directors.

On January 28, Hayes sent a revised draft agreement to KB's attorneys. In the cover letter, Hayes explained the difficulties the staff was having with KB's latest modification. Mr. Hayes stated in part:

George Christopher's letter of January 17 (to part of which Dr. Croft is replying separately in order to correct the errors in its next to last paragraph) stated that $38 million would be infused into Biscayne by KB "in a manner satisfactory to the FSLIC". After Mr. Beesley indicated that FSLIC assistance might be approved on the basis of the first paragraph of that letter, George Christopher then communicated KB's desire to receive subordinated

debt for approximately $20 million of the infusion; and your draft indicates that KB wishes to decide upon the apportionment of stock and securities received without restriction. In view of the words used in the first paragraph of George Christopher's letter of January 17, a lot of people here assumed that the infusion would be represented only by nonwithdrawable stock, and it is possible that anything other than nonwithdrawable stock will be unacceptable.

## BISCAYNE—NEGATIVE NET WORTH— 24.71 MILLION

The parties met on February 2, 1983, but failed to resolve their differences. On February 7, a meeting was held with Pratt, Beesley, Croft, Vartanian, Board Member Jackson and Executive Staff Director J. Buchanan. The purpose of the meeting was for the staff to outline the basic elements of the third proposal and to get some direction from the Board members as to how the staff should conduct its negotiations as to the general outline of elements (1) and (2). Several staff members brought up their doubts about the nonrepayability aspect of element (2) on the ground that it violated Board policy to provide FSLIC funds for the benefit of shareholders of a publicly traded corporation. The staff members also felt that Biscayne should be shopped to see if it was the least costly way for the FHLBB to address the problem.[28] The evidence indicates that Pratt instructed the staff to continue to negotiate and stated that he would consider the proposal even though it contained some deviations from traditional Board policy. None of this was ever conveyed to the Plaintiffs.

On February 7, Broad sent another letter to Beesley and Croft. It appears that this letter arrived sometime after the February 7 meeting referenced above.

The February 7 letter proposed a rights offering of "units" to all Biscayne shareholders—one unit offered per share held. Each unit was to consist of (a) 40 shares of common stock having a par value of $1, and (b) a $40 subordinated debenture having a 15-year term and bearing an interest rate between 12% and 13½%. KB would agree to purchase $38 million worth of units in exchange for IMC (KB's international mortgages subsidiary) and cash. KB would also obtain a firm standby commitment from an underwriter to purchase up to $50 million worth of units less the amount subscribed by shareholders other than KB. FSLIC was to contribute $25 million on a nonrepayable basis. The proposal was designed to raise at least $88 million in additional capital. If it were fully subscribed to, as much as $144 million could be raised.

At the end of the letter, Broad again reiterated:

*If the above arrangements are not satisfactory, KB would once again request that the branch sale transaction before the Bank Board be approved.* (Emphasis added).

KB obtained a letter of intent dated February 16, 1983, from the investment banking firm of Drexel Burnham Lambert. This letter contained a nonbinding agreement to underwrite a $50 million portion of KB's proposed rights offering subject to eight conditions. The first condition was FSLIC's agreement to contribute $25 million to Biscayne. Broad testified that investment bankers had told him that the success of the rights offering was predicated upon FSLIC bringing Biscayne's net worth up to zero on a nonrepayable basis.

The parties continued to meet and exchange comments concerning the proposal for the balance of February and the beginning of March. During February, four main points of difference surfaced concerning the third proposal: (1) the price of the stock to be issued to KB; (2) KB's desire to obtain warrants entitling it to purchase at any time over a period of five years over $200,000 in additional units at the original asking price of $80 per unit; (3) KB's desire

---

**28.** The evidence does not reveal what type of shopping the staff members suggested. *See* *supra,* note 23.

to have the Bank Board waive the dividend restriction and "keep well" requirements which were imposed upon Biscayne and KB when the Board approved KB's acquisition of a controlling interest in Biscayne in 1980; and (4) the affiliated transaction issue. *Repayability to FSLIC was not an issue.*

On February 25, Clem Dinsmore, the staff attorney principally assigned to draft the KB proposal, wrote the following to Wittie:

> You and your client should be aware that Bank Board staff do not subscribe to certain terms and conditions of the Agreement, as revised, e.g. Section 8.1, which the staff understands are not negotiable by your client pending Bank Board consideration of the Agreement. The staff will comment on these provisions, when the Agreement is submitted to the Board.

According to Dinsmore, one of the terms not subscribed was Section 8.1, which refers to the "keep well" provision. Dinsmore did not specify what other sections the staff disfavored and made no mention of the nonrepayability aspect.

## BISCAYNE—NEGATIVE NET WORTH—27.39 MILLION

The evidence indicates that during a meeting held on March 4, the parties resolved the first point by agreeing that the stock would be lettered; i.e., it would be restricted. Point 2 was subject to a fairness opinion and, as Pratt testified to, this was an issue which he knew KB would waive if necessary. For all intents and purposes it was solved as was point 4.

Although the evidence is unclear as to whether the parties discussed point 3 at the March 4 meeting, it is clear that the matter was discussed soon thereafter.

On March 7, Wittie sent Hayes a letter formally advising him that Cal Fed had terminated the branch sale agreement as of March 4. Enclosed with the letter was a copy issued that day of a press release by KB which indicated that discussions between the FHLBB and KB were at an "advanced stage" concerning the recapitalization proposal but that "[t]here can be no assurance that the capital infusion agreement will be reached or consummated." Wittie and Hayes had discussed the wording of this release the previous day.

On March 10, Wittie wrote to Dinsmore that Drexel, Burnham and Lambert, the underwriter for the proposed stock issue by KB, would not enter into a firm underwriting commitment if the Board would not waive the restriction limiting Biscayne's dividends to 50% of net earnings.

On March 14 written contracts embodying the KB proposal had been drawn up and circulated among the staff. The initial recommendation drawn up by the lower level staff members was in favor of the proposal. Plaintiff states that this indicates that the lower staff members were laboring under the same assumptions as was KB; that being, that the Board was prepared to approve the proposal.

On March 15, Dinsmore and Hayes called Wittie. They advised Wittie that the three Office Directors—Beesley, Croft and Vartanian—were strongly opposed to waiver of the dividend restriction. Dinsmore asked whether KB would be willing to delete that condition. Wittie asked if the Office Directors would recommend the proposal if KB gave up that condition. For the first time in two months of negotiations, it was indicated that there would not be any recommendation by the Office Directors to the Board with respect to the KB proposal.

On March 16, Wittie called Hayes. He told Hayes that there were three things the Board could do:

> You could say yes, accept the proposal. The Board could say no, reject the proposal or yes, but. It could say yes, but we want this or that changed. And we, Kaufman & Broad, would obviously have to deal with a 'yes but' and respond to it. In other words, I was not in a position to tell them that we would give up on this point, but if the Board was going to come back and say it would be approved if it were not for that point, then we would respond.

The facts indicate that by this date that Christopher and Wittie had been told and knew that (a) members of the staff had substantial problems with the KB proposal that was going to the Board on March 17, including, for the first time, the nonrepayability aspect of FSLIC's $25 million contribution; (b) that the Office Directors were against waiver of the dividend restriction; (c) that the Office Directors would not recommend in favor of the proposal; and (d) that the staff intended to comment on the objectionable provisions when the proposal was submitted to the Board.

A closed meeting was held on March 17 to consider the KB proposal and other matters as well. KB attorneys were advised that the meeting would occur sometime before that date.

On the morning of March 17 the staff directors, Beesley, Vartanian and Croft met and agreed that they *opposed the nonrepayability aspect of the proposal.* They agreed to offer no recommendation to the Board.

The evidence indicates that not only did the staff members not offer a recommendation at the meeting but they also expressed their uniform reservations about the nonrepayability aspect. Vartanian spoke first about his concerns with the proposals. Among the concerns mentioned by Vartanian were the inability of the Board to get an accurate estimate of the value of the institution and the cost of the proposed deal in the absence of shopping the deal and receiving bids for Biscayne. Vartanian stated that shopping would be the best way for the Board to determine whether or not the proposal was the least costly deal. Vartanian also noted that he felt that the proposal had changed from the time that it was originally presented to the staff on January 14 (although the differences between had been resolved); and that it called for a government underwriting of a public stock offering. He was also concerned with whether Biscayne could raise the money it needed in the market for the stock offering. Beesley echoed Vartanian's concerns and doubts about the proposal.

The kindest description of the Chairman's reaction to the staff position was "surprise" that the staff had not recommended the proposal. He was also concerned that they had not considered the alternatives should the Board decide to turn down the proposal.

The meeting went on the record briefly for 19 minutes for a factual presentation of the circumstances surrounding the proposal and for a short discussion of the financial condition of Biscayne.

The Plaintiffs argue that the actions taken by the staff and the Office Directors from March 18 to the date of the Board resolutions turning down the proposal and installing a receiver were all done to prepare the record for administrative review. According to the Plaintiffs, the decisions to reject the proposal and appoint the receiver were made for all intents and purposes on March 17. They dispute both Pratt's testimony that he didn't decide until April 6 and the admission that in late March Board member Jackson told Beesley that he still had "hard questions to ask" about Biscayne. It is apparent that "the die was cast" on March 17 because there would be no recommendation supporting the proposal. The remaining question concerned alternatives.

On March 22 the staff prepared a memo in which it analyzed the four alternatives from which it thought the Board could choose in deciding on the future of Biscayne and the recapitalization proposal. The four alternatives presented were:

(1) Making a counteroffer to KB, which if accepted within a brief, specified time period the Bank Board would approve;

(2) Rejecting the proposal, ordering the suspension of all trading in Biscayne's stock pending dissemination of the disclosure of the Bank Board's action, and shopping Biscayne, with the result that the appointment of a conservator or receiver is deferred so long as Biscayne cooperates with the FSLIC by allowing access to its books and records and its financial condition does not seriously deteriorate;

(3) Appointing a conservator for Biscayne pending the completion of FSLIC's

shopping of Biscayne and the negotiation of a long term solution and deferring the appointment of a receiver until it is necessary to deliver Biscayne, provided that Biscayne's staff cooperates with the conservator; or

(4) Appointing a receiver for the purpose of Biscayne's liquidation, immediately transferring Biscayne's assets and liabilities to a newly-chartered Federal mutual association, and operating the new mutual under FSLIC-selected directors and management pending the completion of FSLIC's shopping of Biscayne and negotiation of a long term solution.

Later that same day a meeting was held with various staff members including Hayes, Croft, Dorer, Roy, Buchanan and Lois Jacobs who served as assistant to Board member Jackson. The four alternatives mentioned above were discussed. The evidence indicates that the consensus of the meeting was that alternative (2) one of the least drastic measures, should be recommended to the Board.

Following the meeting, Buchanan briefed Pratt what had been discussed. Later the same day Pratt interrupted a telephone conversation in which Hayes was discussing the staff meeting with Vartanian. Pratt indicated that option (2) was unrealistic and impractical. Pratt went on to say that under option (2) the possibility of a run was more likely. He also stated that if litigation resulted while the institution was still in the hands of the management, it could frustrate the shopping of the institution were the Board to decide that such shopping would be needed. Vartanian echoed Pratt's concerns and agreed with the conclusion. This connection underscores Plaintiffs' contention that Pratt acted in a dual capacity. In the conversation he was speaking as the Chief Executive Officer on a matter that he allegedly was going to study in a quasi-judicial capacity as Chairman of the Board on April 6, 1983.

During the week of March 21, the staff met with various members of the law firm retained by the FHLBB. Part of the conversation concerned the advantages and disadvantages of the various options available to the Board.

Plaintiffs maintain that the sessions with the outside counsel were held for the purpose of "constructing an administrative record for administrative purposes while keeping the real motivations and actions of the staff off the record and unavailable for the review of this Court...." Plaintiffs also believe that the real motivation of the staff, if not the Board itself, is evidenced in a staff memo drawn up on March 23 by OES. Hayes said that this memo was not circulated. Ann Loikow, who works directly under Mr. Hayes, testified that the staff had used the memorandum dated March 23, 1983, as a discussion document during at least one meeting. Mr. Roy also recalls a meeting at which the staff discussed "the options paper OGC (Office of General Counsel) had drafted."

Plaintiffs refer to a passage in the March 23 memorandum in which there is a discussion concerning litigation strategy. It says:

If KB or Biscayne is expected to challenge the FSLIC's actions on Biscayne, the FSLIC is in a better litigation position if it has already taken control of the association through the appointment of a conservator or receiver. In this respect, the FSLIC is in the best position if it has appointed a receiver who has already transferred Biscayne's assets and liabilities to a new association because it is much more difficult for a court to unscramble that transaction than to remove a conservator from possession of Biscayne.

Plaintiffs also point to another passage in the memorandum which discusses the comparative advantages of option (3) (appointing a conservator) and option (4) (appointing a receiver) as opposed to the other options. The memorandum states:

Each exposes the Bank Board to the risk that a court may find that the Bank Board has acted unreasonably under the circumstances. The only ground for the appointment of a conservator or receiver is Biscayne's insolvency, which has existed since July, 1982. While the Board's

staff has considered several branch sales and KB's recapitalization proposal during the intervening months, the Bank Board's delay in decisive action on Biscayne's insolvency creates a need to explain what circumstances make the appointment necessary now. The litigation posture of the Bank Board would be stronger if it was able to point to circumstances in addition to Biscayne's insolvency. The advantage of Option Two is that it defers appointment of a conservator or receiver until those circumstances more clearly exist. However, it is possible that the suspension in trading of Biscayne's stock would trigger the kind of change in circumstances that would necessitate the immediate appointment of a conservator or receiver.

The memorandum concludes with a recommendation based on the merits of each option. The memorandum states:

We have considered the advantages and disadvantages of each option and recommend that the Bank Board exercise Option Four, based on the following considerations:

(1) Option One is not likely to produce an agreement with KB because KB has stated its unwillingness to negotiate substantial changes in its current proposal.

(2) Option Two is unrealistic in its assumption that KB and Biscayne will cooperate with the FSLIC. Biscayne previously has refused the FSLIC's requests for a merger consent resolution. The reasons given for that refusal are likely to be given again to justify a refusal by Biscayne to disclose its books and records to potential bidders. KB will have no reason to cooperate with the FSLIC after the Board has rejected KB's proposal.

(3) Option Three presents managerial problems that might result in a reluctant and compromising dependence of the conservator on Biscayne's senior staff. Option Three also might trigger litigation challenging the conservatorship and the powers of the conservator which could complicate and delay the Bank Board's appointment of a receiver.

(4) Option Four avoids the risk that some of Biscayne's existing stockholders or other market participants might be able to profit at the expense of an uninformed investor. By requiring all Biscayne shareholders to realize their gain or loss at the same moment in time, Option Four prevents any possibility of subsequent trading on unshared information that hasn't been fully disseminated, which could allow the knowing speculator a profit at the expense of the unknowing small investor.

There is no question in the Court's mind, regardless of the testimony of the Board members, that by March 23 what was left for determination on April 6 was which alternative to adopt and that Chairman Pratt had rejected alternatives 1 and 2. The decision on the KB Proposal was a *fait accompli.*

Between March 25 and April 6, 1983, a series of communications and conferences were held between the staff of FHLBB and the representatives of KB. Some of these communications took the form of letters from Vartanian to Christopher dated March 25 and April 1; a letter from Broad delivered by Christopher to Vartanian, the original of which was intended for Chairman Pratt; and Christopher's reply to Vartanian's letter (April 5) and a meeting held on April 1 between Beesley, Vartanian and Broad in Los Angeles, California. In addition to these communications, meetings were held between the staff and Board members of the FHLBB. On March 31, there was likewise a meeting held in the General Counsel's office between Vartanian, Hayes, Gunther and Dinsmore.

Plaintiffs characterize the letters received from Vartanian and the meeting between Beesley, Vartanian and Broad as nothing more than a last minute effort to establish an administrative record. They assert that although Vartanian's letter purported to be interested in receiving KB's last offer, the only reason it was written was to show that an offer was submitted for final action. Although there was reference to the dividend restriction issue, it is

apparent that the overriding issue continued to be nonrepayability. The nonrepayable aspect was one of the two reasons upon which the Board rejected the proposal. Board Resolution 83–184 stated in pertinent part:

The proposed agreements ("proposal") are unsatisfactory in that, among other reasons (1) the proposal contemplates and would permit present stockholders of Biscayne substantially to salvage, recover or profit from their investment in Biscayne prior to and without the FSLIC's cash contribution being repaid in whole or part contrary to established and uniform Board policy, and (2) it cannot now be ascertained whether, and is doubtful that, of all solutions that are or may be available to the FSLIC, the proposal represents a solution to Biscayne's supervisory difficulties that has the least cost and risk to FSLIC.

The second criteria, the need to shop the proposal, was never discussed by the staff with KB from the time the branch sale was proposed in August, 1982 until April 6. It is clear that both parties were negotiating under the clear dictate by Pratt to bring the proposal to the Board for final approval.

Plaintiffs view the meeting of March 31 with Vartanian and his staff as evidence of improper behavior. Plaintiffs state that the Board wanted to posture the KB proposal as its last and best offer to create a record rather than dealing forthrightly with KB's proposal. The participants in that meeting had the responsibility of advising the Board relative to the legal ramifications of whatever course of conduct was ultimately decided upon. Merely because they met to discuss the alternative of formulating such advice and to fulfill their responsibility to the Board cannot be viewed by the Court as demonstrating either improper behavior or an improper motive.

The fact remains, however, that this record clearly establishes in the Court's view that from March 17 until April 6 it was only a question of what alternative would be recommended by the staff to the Board. As previously noted on March 22, the Chief Executive Officer of FHLBB clearly directed the staff to delete from favorable consideration alternatives 1 and 2 and to strictly limit its consideration to items 3 and 4.

As will be more fully discussed in the portion of this opinion devoted to Count II, the facts as they unfolded subsequent to March 17 are only pertinent to the extent that they ultimately resulted in the Board adopting Resolutions 83–184 and 83–185. The latter resolution called for the appointment of a receiver on the ground that ["(1) the Association is insolvent in that its assets are less than its obligations to its creditors and others, including its withdrawable accountholders and (2) the Association is in an unsafe and unsound condition to transact business. . . ."]

As to the second ground for the resolution, this Court has clearly enunciated its finding that the record is devoid of any evidence either before this Court or before the Board to support such finding. The Defendants chose not to rebut Plaintiffs' argument that Biscayne was not in an unsafe and unsound condition.

## COUNT I—ESTOPPEL

■ Plaintiffs assert in Count I of the complaint that the FHLBB is estopped from appointing a receiver on the grounds that Biscayne was insolvent. Plaintiffs argue that the FHLBB "created" the insolvency and that the "entire course of dealing was affirmatively misleading".

Prior to discussing the merits of the estoppel claim, the Court shall narrow the issue presented. While Plaintiffs' complaint alleges that Defendants "created" Plaintiffs' insolvency, Plaintiffs stated at closing argument that they did not ascribe any misbehavior or untoward conduct to the Defendants during the first phase of the negotiations. The first phase of negotiations ended with the presentation of the first branch sale proposal to the staff in July 1982. The second phase of negotiations did not begin until, at the earliest, the end of August when the staff was notified of Biscayne's new agreement with Cal Fed. By the end of July 1982, Biscayne had a

negative net worth of $3.93 million; its negative net worth at the end of August 1982 was $8.68 million.

It is clear that the FHLBB did not create Biscayne's insolvency. Therefore, the estoppel issue concerns whether the Defendants' conduct misled the Plaintiffs into not undertaking some action to regain solvency.

The issue of whether the government can be estopped has been presented to the Supreme Court on several occasions. The Supreme Court has never held that the Government can be estopped or explained what type of behavior would engender an explication of the parameters of the estoppel doctrine.

In the earliest case in which the Supreme Court considered this issue, the Court held that the Government could not be estopped on account of the erroneous information given by a representative of the federally owned crop insurance corporation to a wheat grower. The grower was told that his crop would be insured by the federal corporation. Based on this information he did not seek an alternative way to insure his crop. When the grower sought compensation under the federal insurance program for his destroyed crop, he was told that the regulations did not provide for insurance for his crop. *Federal Crop Insurance Corp. v. Merrill*, 332 U.S. 380, 382, 68 S.Ct. 1, 2, 92 L.Ed. 10 (1947).

The Court held that the Government could not be estopped from denying insurance. The Court reasoned that despite not having actual knowledge of the regulation, the grower had "legal notice" of the rules and regulations of the insurance fund. *Merrill*, 332 U.S. at 385, 68 S.Ct. at 3. "[T]he ignorance of such a restriction, either by the respondents or the Corporation agent, would be immaterial and recovery could not be had against the Corporation for loss of such reseeded wheat." *Merrill*, 332 U.S. at 384, 68 S.Ct. at 3.

In *Montana v. Kennedy*, 366 U.S. 308, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961), petitioner argued that the Government should be estopped from denying him citizenship because had it not been for the erroneous information given to his mother by an American consular officer, he would have been qualified for citizenship under the applicable statute. The Court held that it did not have to reach the issue of estoppel because the consular officer's action "falls short of misconduct such as might prevent the United States from relying on petitioner's foreign birth." *Montana*, 366 U.S. at 314–15, 81 S.Ct. at 1340–41. The Court intimated that the consular officer's statement may have been "well meant advice" and not an affirmative statement. *Montana*, 366 U.S. at 314, 81 S.Ct. at 1340.

In *INS v. Hibi*, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973) (per curiam), the Court held that the Government's failure to publicize the rights to naturalization or to have a representative in the Phillipines advising eligible applicants could not estop the Government from denying citizenship. Filipino petitioner claimed that had he been advised of his eligibility, he would have applied and been eligible for citizenship. *Hibi*, 414 U.S. at 8–9, 94 S.Ct. at 21–22.

In *Hibi*, the Court noted that in *Montana* "the issue of whether 'affirmative misconduct' on the part of the Government might estop it from denying citizenship was left open." *Hibi*, 414 U.S. at 8, 94 S.Ct. at 21–22. The Court did not reach this issue in *Hibi* because "no conduct of the sort there adverted to was involved here." *Hibi*, 414 U.S. at 8, 94 S.Ct. at 21.

In its most recent decision in which the issue was raised the Court said:

> This Court has never decided what type of conduct by a Government employee will estop the Government from insisting upon compliance with valid regulations governing the distribution of welfare benefits. In two cases involving denial of citizenship, the Court declined to decide whether even "affirmative misconduct" would estop the Government from denying citizenship, for in neither case was "affirmative misconduct" involved.

*Schweiker v. Hansen*, 450 U.S. 785, 789, 101 S.Ct. 1468, 1471, 67 L.Ed.2d 685 (1981) (per curiam).

In *Hansen* a Social Security Administration (SSA) field representative erroneously told a potential applicant that she was not eligible for certain benefits. The statement was incorrect and in contravention of the directives of the SSA claims manual used by the field representatives. On the representative's advice, the potential applicant did not file an application though she would have been entitled to benefits. *Hansen,* 450 U.S. at 786, 101 S.Ct. at 1469–70.

In reversing the Circuit Court decision, the Court stated that the representative's "errors 'fal[l] far short' of conduct which could raise a serious question whether petitioner is estopped from insisting upon compliance with the valid regulation." *Hansen,* 450 U.S. at 790, 101 S.Ct. at 1472 [quoting *Montana v. Kennedy,* 366 U.S. 308, 314, 81 S.Ct. 1336, 1340, 6 L.Ed.2d 313 (1961)]. The Court noted that "at worst, [the repre-

sentative's] conduct did not cause [the applicant] to take action, *cf. Federal Crop Insurance Corp. v. Merrill, supra,* or fail to take action, *cf. Montana v. Kennedy, supra,* that [the applicant] could not correct at any time." *Hansen,* 450 U.S. at 789, 101 S.Ct. at 1471.[29]

In the absence of a Supreme Court directive rejecting the contention that the Government can be estopped under all circumstances, several Circuit Courts have developed their own law on this issue. *See United States v. Ruby Company,* 588 F.2d 697 (9th Cir.1978); *Massaglia v. CIR,* 286 F.2d 258 (10th Cir.1961).[30]

In discussing this issue the Fifth and Eleventh Circuits have distinguished between governmental action taken in a "proprietary" manner and action taken in a "sovereign" manner.[31] The Fifth Circuit has stated:

**29.** The Court does not believe that *Moser v. United States,* 341 U.S. 41, 71 S.Ct. 553, 95 L.Ed. 729 (1951) serves as guiding precedent in this case. In *Moser* the Government gave Petitioner incorrect information upon which he made a decision affecting his subsequent application for citizenship. The Court, declining to address the estoppel issue, held that the Government could not enforce the regulation. The Court said:

> There is no need to evaluate these circumstances on the basis of any estoppel of the Government or the power of the Swiss Legation to bind the United States by its advice to petitioner. Petitioner did not knowingly and intentionally waive his rights to citizenship. In fact, because of the misleading circumstances of this case, he never had an opportunity to make an intelligent election between the diametrically opposed courses required as a matter of strict law. Considering all the circumstances of the case, we think that to bar petitioner, nothing less than an intelligent waiver is required by elementary fairness. *Johnson v. United States,* 318 U.S. 189, 197 [63 S.Ct. 549, 553, 87 L.Ed. 704]. To hold otherwise would be to entrap petitioner.

*Moser,* 341 U.S. at 47, 71 S.Ct. at 556. Although the Ninth Circuit has interpreted *Moser* as granting an estoppel, this Court believes that the explicit language of *Moser* and the failure of the Supreme Court to mention *Moser* in subsequent cases concerning estoppel make tenuous any precedential value *Moser* might have for the present case.

**30.** The Ninth Circuit believes that the Government may be estopped where "justice and fair play require it." *United States v. Lazy FC*

*Ranch,* 481 F.2d 985, 989 (9th Cir.1973). Petitioner must prove the elements of an equitable estoppel and further show that the government engaged in "affirmative misconduct as opposed to a mere failure to inform or assist." *Lavin v. Marsh,* 644 F.2d 1378, 1382 (9th Cir.1981).

The Ninth Circuit has indicated that the Court must apply a balancing test when deciding whether to grant an estoppel. The Ninth Circuit stated:

> On the one side, the court must weigh the tendency of "the government's wrongful conduct ... to work a serious injustice ..." Against this consideration, the court must balance the countervailing interest of the public "not [to] be unduly damaged by the imposition of estoppel." These policy factors may militate against application of estoppel even though the technical elements of the doctrine are present.

*United States v. Ruby,* 588 F.2d at 703, (*citing United States v. FC Ranch,* 481 F.2d 985, 989 (9th Cir.1973)).

The Ninth Circuit has also rejected the "dichotomy which allows estoppel against the government when based on 'proprietary conduct', and disallows estoppel based on conduct resulting from government's 'sovereign' functions." *Ruby,* 588 F.2d at 702; *Lazy FC Ranch,* 481 F.2d at 989.

**31.** Fifth Circuit decisions rendered prior to October 1, 1981, serve as precedent for the Eleventh Circuit. *Bonner v. City of Pritchard,* 661 F.2d 1206 (11th Cir.1981) (en banc).

Whether the defense of estoppel may be asserted against the United States in actions instituted by it depends upon whether such actions arise out of transactions entered into in its proprietory capacity or contract relationships, or whether the actions arise out of the exercise of its powers of government. The United States is not subject to an estoppel which impedes the exercise of the powers of government, and is not estopped to deny the validity of a transaction or agreement which the law does not sanction. Nor does an estoppel arise through an act or representation made by an officer or agent without authority to act for the government in the premises.

*United States v. Florida*, 482 F.2d 205, 209 (5th Cir.1973).

The Fifth and Eleventh Circuits have never estopped the Government from acting in its sovereign manner. *See Deltona Corporation v. Alexander*, 682 F.2d 888 (11th Cir.1982); *Hicks v. Harris*, 606 F.2d 65 (5th Cir.1979); *United States v. Florida*, 482 F.2d 205 (5th Cir.1973).[32] The Eleventh Circuit has acknowledged that the Ninth Circuit has estopped the Government upon a showing that the Government engaged in "affirmative misconduct". *See, Deltona*, 682 F.2d at 891 n. 4, 892 n. 6. In *Deltona*, the Court stated that it did not have to decide whether the "affirmative misconduct" exception would apply because "none of the alleged conduct rises to the level of 'affirmative misconduct'". *Deltona*, 682 F.2d at 892. In deciding whether affirmative misconduct was evidenced, the Court noted that "silence, acquiescence, or even negligence fall far short of 'affirmative

misconduct'". *Deltona*, 682 F.2d at 892 n. 6.

Although the *Hansen* and *Deltona* decisions indicate an awareness that the "affirmative misconduct" doctrine has gained a measure of recognition, the Court does not believe, as Plaintiffs argue, that the doctrine is the law of this Circuit. This Court is of the view that neither *Hansen* or *Deltona* have altered the previous pronouncements of the Fifth Circuit that estoppel cannot be applied against the Government when it is acting in its sovereign capacity.

Plaintiffs do not deny that the FHLBB was acting in its sovereign power in its dealings with KB. The Court believes that under the broad view of sovereign action utilized by the Fifth and Eleventh Circuits, the FHLBB was acting within its sovereign power.[33] Accordingly and on that basis, the Court believes that Plaintiffs' estoppel argument is without merit.

## COUNT III—LEAST DRASTIC REMEDY

Plaintiff contends in Count III of the complaint that the Board abused its discretion in appointing a receiver when there existed a less drastic remedy. Plaintiff bases its argument on the congressional history of § 1464(d)(6)(A) as amended in 1966 and its understanding of the holding in *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). Statutory construction "must begin with the language of the statute itself," *Dawson Chemical Co. v. Rohm & Haas Co.*, 448 U.S. 176, 187, 100 S.Ct. 2601, 2608, 65 L.Ed.2d 696 (1980). In interpreting a statute, the Court must give effect to its plain meaning. *Albright v. United States*, 631 F.2d 915, 918 (D.C.Cir.1980). When the

---

**32.** Plaintiffs' reliance on *United States v. Tweel*, 550 F.2d 297 (5th Cir.1977) for the proposition that Defendants' actions showed a "sneaky, deliberate deception" is misplaced. *Tweel*, 550 F.2d at 299. *Tweel* invoked the Government's violation of a taxpayer's fifth amendment rights in a criminal investigation. The issue of estoppel was never raised.

**33.** The Fifth Circuit held that the "ceding of land by the United States Government to the State of Florida for public park purposes is a governmental function, the action itself being

for the benefit of the public." *United States v. Florida*, 482 F.2d 205, 209 (5th Cir.1973).

The Fifth Circuit held that the Government was acting in its sovereign powers when it encouraged lenders to make student loans. *Hicks v. Harris*, 606 F.2d 65, 68 (5th Cir.1979).

The Eleventh Circuit held that the act of granting a permit for a developer's dredge and fill activities was an exercise of the Government's sovereign power to protect the public interest. *Deltona Corporation v. Alexander*, 682 F.2d 888, 892 (11th Cir.1982).

terms of the statute are unambiguous, judicial inquiry is complete absent a clearly expressed legislative intent to the contrary. *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633 (1981); *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

Plaintiffs contend that the Board should use cease and desist orders as a less drastic remedy. The relevant statutory language indicates that cease and desist orders or the suspension of an officer concern situations where the Board has reason to believe that the association is about to engage in an unsafe or unsound practice or violation of the law or an agency regulation. *See* 12 U.S.C. § 1464(d)(6)(A). There is no indication in 12 U.S.C. § 1464(d) *et seq.* that the FHLBB must consider whether there are available remedies less drastic than the appointment of a receiver nor does the statute mention any such less drastic remedies. There is no indication that the cease and desist order or the suspension of an officer is available or has any applicability when the Board is considering the future of an association which is not engaging in unsound or illegal acts but which nonetheless is insolvent.

■ The Court feels that the unambiguous language of § 1464(d) *et seq.* is that the Board may exercise its discretion to appoint a receiver if one of the statutory criteria is met without having to consider whether less drastic remedies exist. The Court believes that Plaintiff's argument would create a conflict between § 1464(d)(2)(A) and § 1464(d)(6)(A) by impinging on the Board's discretion to appoint a receiver if one of the statutory criteria under § 1464(d)(6)(A) is met and there is no showing of an abuse of discretion. Plaintiffs' interpretation would not allow the Board to exercise such discretion if a lesser drastic remedy existed. There is no such limitation placed on the Board under § 1464(d)(6)(A). In declining to accept Plaintiffs' interpretation of the statute based on the terms of the statute itself, the Court notes that statutory provisions, whenever possible, should be construed as to be consistent and not contradictory with each other. *See Montgomery Charter Service v. Washington Metropolitan Area Transit Commission,* 325 F.2d 230, 234 (D.C.Cir.1963).

Having determined that the language of the statute is unambiguous, the Court must determine whether the language is contrary to the clear legislative intent. *See Rubin v. United States,* 449 U.S. at 430, 101 S.Ct. at 701.

Plaintiff relies on a couple of passages from the Senate Report of the Financial Institutions Supervisory Act of 1966 to support its contention that the FHLBB may only appoint a receiver when there exist no less drastic remedies. Plaintiffs rely principally on the following excerpts:

The only immediately effective remedy available to the Board is to take custody of a Federal association under section 5(d)(2) of the Home Owners' Loan Act. *Such action is, of course, a drastic remedy and is employed only as a last resort.* But where management is uncooperative, it is the only means by which the Board may minimize losses by putting an immediate stop to violations of law or improper practices. Present law provides no other protection against increased losses caused by the continuation of such violations or practices while time-consuming enforcement proceedings are in progress.

1966 U.S.Code Cong. & Ad.News, S.Rep. No. 1482, 89th Cong., 2d Sess. 3532, 3537–38 (1966) (emphasis added).

In the light of the new enforcement powers provided by the bill, *the committee would expect the Board to appoint a conservator or receiver only in cases where it judged that the exercise of the lesser intermediate remedies* would not adequately protect the interests of the public or of the savings account holders of the association or of the Federal Savings and Loan Insurance Corporation.

*Id.* at 3545 (emphasis added).

The Court believes that there is nothing in the two quotes cited by the Plaintiffs or anywhere else in the legislative history that would contradict the plain meaning of the

statute. While the language cited above states that the committee "would expect the Board to appoint a . . . receiver only in cases where it judged that the exercise of the lesser intermediate remedies would not adequately protect . . ." the committee stops short of saying that it will require the Board to make such a determination or finding prior to the appointment of a receiver.

The Senate Committee which authored the above-quoted language considered and rejected proposals which would have incorporated into § 1464(d)(6)(A), as a condition precedent to the appointment of a conservator or receiver, a provision that the Board first find that use of its cease and desist powers would not provide an effective remedy. For example, the National League of Insured Savings Associations proposed that § 1464(d)(6)(A) provide, *inter alia,* that:

> If the Board finds in writing that a ground for the appointment of a conservator or receiver as herein provided exists *that cannot be adequately remedied by proceedings toward issuance of a cease and desist order,* the Board is authorized to petition a judge of the United States district court for the judicial district in which the home office of the Association is located to appoint ex parte and without notice a conservator or receiver for the Association.

Financial Institutions Supervisory Act of 1966. Hearings on S. 3158 before a Subcommittee of the Senate Committee on Banking and Currency, 89th Cong., 2d Sess. 324 (1966) (emphasis added).

And the California Savings and Loan League proposed that subsection (6)(A) provide, *inter alia:*

> If the Board finds that a ground for the appointment of a conservator or receiver as herein provided exists, *and the issuance and enforcement of one or more cease-and-desist orders would not protect the public interest or the interests of the Association or its savings account holders or creditors,* the Board is authorized to appoint *ex parte* and without notice a

conservator or receiver for the Association.

*Id.* at 352 (emphasis added).

The Committee rejected both proposals, choosing not to impose any such precondition on the Board's power to appoint a receiver.

The purpose of the Financial Institutions Supervisory Act of 1966, Pub.L. No. 89–695, 80 Stat. 1028 (1966), was "to strengthen the regulatory and supervisory authority of Federal agencies over insured banks and insured savings and loan associations" . . . 1966 U.S.Code Cong. & Ad.News, S.Rep. No. 1482, 89th Cong., 2d Sess. 3532 (1966). The general statement at the beginning of the Senate Report indicates that the purpose of the bill was to give several banking agencies, including the Federal Home Loan Bank Board:

> Authority to issue cease-and-desist orders or suspension or removal orders subject to standards and procedures designed to protect both the institutions involved, and their officials and the depositors, savers and others interested in the sound and effective operation of the financial institutions. These powers would be granted, as intermediate powers short of conservatorship or withdrawal of insurance, in order to prevent violations of law or regulation and unsafe and unsound practices which otherwise might adversely affect the Nation's financial institutions, with resulting harmful consequences to the growth and development of the Nation's economy.

1966 U.S.Code Cong. & Ad.News at 3533.

It is clear from the Senate report that the main concern of Congress was to provide the FHLBB with a means of preventing "violations of law or regulations and unsafe and unsound practices", 1966 U.S.Code Cong. & Ad.News at 3533. Congress was not addressing possible remedies for insolvent associations. Congress felt that the FHLBB had been handicapped in dealing with these practices and that the Board's available remedies were either too lenient or too drastic. The intermediate remedies which Congress devised for handling unsafe

practices or violations of law were the power to issue a cease and desist order or to suspend or remove an officer of the association. These are the "lesser intermediate remedies" referred to in page 3545 of the Senate report quoted above.

There is no indication that Congress considered the use of these "lesser intermediate remedies" with respect to insolvent associations. Even if the Board were obligated to consider one of the lesser drastic remedies, the Court does not fathom how the Board could demand that an institution cease and desist from being insolvent.

■ Plaintiffs further argue that the two quotes cited above stand for the proposition that even if cease and desist or suspension orders are not appropriate, the Board should never impose a receiver unless no less drastic remedies exist. Plaintiffs do not state what the "lesser intermediate remedies" are though they believe that one alternative is "working with management where management is cooperative." Plaintiffs also suggest that since the legislative history indicates that the Board need not make a specific *finding* that no less drastic remedy exists, the Court should somehow decide whether a less drastic remedy existed. The Court finds no statutory, legislative or logical support for this contention and believes that it contravenes the purpose of establishing an agency whose function is to utilize its expertise to supervise the savings and loan association.[34] The administrative agency is not obligated to devise a less drastic remedy or agree to assist management of an insolvent institution. The burden of choosing a less drastic remedy certainly does not rest with the Court.

Plaintiffs' second ground for arguing that the Board must choose the least drastic remedy is based on its understanding of *Fahey v. Mallonee,* 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947).

In *Fahey,* the FHLBB appointed a conservator for a solvent association on the basis "that the Association was conducting its affairs in an unlawful, unauthorized and unsafe manner, that its management was unfit and unsafe, that it was pursuing a course injurious to and jeopardizing the interests of its members, creditors and the public." *Fahey,* 332 U.S. at 247, 67 S.Ct. at 1553. At the time of the *Fahey* decision, § 1464(d) did not delineate the grounds upon which a receiver could be appointed. Congress authorized the FHLBB to adopt its own regulations setting forth the grounds for such an appointment. The grounds for the appointment of a receiver pursuant to the FHLBB's regulations were substantially identical to the grounds presently set forth in § 1464(d)(6)(A). *Compare Fahey,* 332 U.S. at 250 n. 1, 67 S.Ct. at 1554 n. 1 with 12 U.S.C. § 1464(d)(6)(A).

In *Fahey* the District Court removed the conservator on the basis that the statute which did not spell out the grounds for the appointment of a receiver constituted an unconstitutional delegation of the "legislative functions to the supervising authority without adequate standards of action or guides to policy." *Fahey,* 332 U.S. at 249, 67 S.Ct. at 1553. The District Court relied on *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) and *Schechter Poultry Corporation v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935).

Reversing the District Court, the Supreme Court stated:

The Board adopted rules and regulations governing appointment of conservators. They provided the grounds upon which a conservator might be named, and they are the usual and conventional grounds found in most state and federal banking statutes. They are sufficiently explicit,

---

**34.** Plaintiff's argument that the Court should decide at a *de novo* hearing whether a lesser intermediate remedy betrays the language relied on by the Plaintiff. The Senate Committee stated that it "would expect the Board to appoint a conservator or receiver only where it judged that the exercise of the lesser intermedi-

ate remedies would not adequately protect the interests of the public ..." 1966 U.S.Code Cong. & Ad.News at 3545. This quote clearly states that the discretion is to be left to the Board to decide whether a lesser intermediate remedy exists. There is no indication that the Court is to make such a determination.

*against the background of custom,* to be adequate for proper administration and for judicial review if there should be a proper occasion for it.

*Fahey,* 332 U.S. at 252–53, 67 S.Ct. at 1554 (emphasis added).

 Plaintiffs argue that the above-quoted language and one other passage from *Fahey* stands for the proposition that "well defined practices" and "well known and generally acceptable standards" constitute "the background of custom" which is found in the common law of receivership.[35] One of these generally accepted standards under common law is that a receiver should be appointed only in the absence of less drastic remedy.[36]

The Court believes that Plaintiffs' argument is unsupported by the holding in *Fahey.* Justice Jackson's opinion is a refutation of the contention that Congress unconstitutionally delegated its responsibility to the Board. In upholding the delegation to the Board, Justice Jackson stated that the regulations outlining the appointment of a receiver were sufficiently explicit "against the background of custom" to withstand a constitutional challenge. The Supreme Court reasoned that the standards estab-

lished by the Board were within the defined parameters for such appointment under other banking statutes; the various grounds for the appointment of a receiver were "sufficiently explicit" because they are the usual and ordinary grounds found in most state and federal banking statutes." *Fahey,* 332 U.S. at 253, 67 S.Ct. at 1555. Insolvency was one of these grounds.

As applied to the facts of the present case, the holding in *Fahey* supports the proposition that insolvency had been a usual and ordinary ground for the appointment of a receiver under established banking law; the Board's determination that insolvency should be one of the grounds was explicit enough to render constitutional Congress' delegation to the Board.

This Court finds that *Fahey* does not impose an obligation upon the Board to apply common law standards when deciding whether or not to appoint a receiver. The Court believes that the FHLBB's power to appoint a receiver for an insolvent institution pursuant to a constitutionally valid criteria presents a different situation than a court's appointment of a receiver pursuant to its equity powers under common law.[37]

---

**35.** The other passage upon which Plaintiffs base its argument states:

> It may be that explicit standards in the Home Owner's Loan Act would have been a desirable assurance of responsible administration. But the provisions of the statute under attack are not penal provisions. . . . The provisions are regulatory. They do not deal with unprecedented economic problems of varied industries.
> They deal with a single type of enterprise and with the problems of insecurity and mismanagement which are as old as banking enterprise. *The remedies which are authorized are not new ones unknown to existing law to be invented by the Board in exercise of a lawless range of power.* Banking is one of the longest regulated and most closely supervised of public callings. It is one in which accumulated experience of supervisors, acting for many states under various statutes has established *well-defined practices for the appointment of conservators, receivers and liquidators.* Corporate management is a field, too, in which courts have experience and many precedents have crystallized into *well-known and generally acceptable standards.* A discretion to make regulations to

guide a supervisory action in such matters may be constitutionally permissible while it might not be allowable to authorize creation of new crimes in uncharted field.
*Fahey,* 332 U.S. at 250–52, 67 S.Ct. at 1554 (emphasis added) (footnotes omitted).

**36.** The other common law prerequisites for the appointment of a receiver which Plaintiffs believe should be considered in the instant case are:

> (1) a receivership is needed to preserve property pending final disposition;
> (2) there has been fraud, mismanagement or imminent danger of loss of property;
> (3) the resulting good will outweigh the harm done by the appointment;
> (4) the rights of shareholders have been considered; and
> (5) the receivership will preserve, not destroy, existing rights.

**37.** Applying the common law principles, Plaintiffs declare that the Board's decision to appoint a receiver to "wipe out" Shareholders' rights and to "clear title" before delivering the institution to a new entity is an abuse of discretion. The Court believes that the property

## COUNT IV—DUE PROCESS

Count IV of the complaint charges that the Board's *ex parte* appointment of a receiver violated Biscayne's due process rights. Plaintiff does not argue that the *ex parte* procedure outlined in 12 U.S.C. § 1464(d)(6)(A) is facially unconstitutional. Biscayne argues that the *ex parte* procedure may only be invoked upon a showing of an "emergency situation" and since there was no showing of an emergency situation in the present case, the statute was unconstitutionally applied. In their complaint, Plaintiffs' argument concerning the "emergency situation" was in Count III. In their final briefs, it appears that Plaintiffs present this argument under the rubric of due process contained in Count IV. The Court feels that the discussion of whether the Board must demonstrate that an emergency situation exists is an integral part of Plaintiffs' other due process arguments and it will, therefore, be discussed under Count IV.

■■■ Plaintiffs' argument that an emergency must exist before the FHLBB may appoint a receiver is predicated on *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972) and *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). The summary procedure set forth in § 1464(d)(6)(A) which allows the appointment of a receiver "*ex parte* and without notice" does not transgress the procedural due process requirements of the Fifth Amendment. *Fahey v. Mallonee*, 332 U.S. 245, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947). At the time *Fahey* was decided, § 1464(d) did not provide for *ex parte* appointment of conservators without notice to the affected association; however, the FHLBB's own regulations so provided. In *Fahey,* the Supreme Court held that the *ex parte* procedure set forth in the Board's regulations was constitutional. The Court stated:

It is complained that these regulations provide for hearing after the conservator takes possession instead of before. This is a drastic procedure. But the delicate nature of the institution and the impossibility of preserving credit during an investigation has made it an almost invariable custom to apply supervisory authority in a summary manner. It is a heavy responsibility to be exercised with disinterestedness and restraint, but in the light of the history and customs of banking we cannot say it is unconstitutional. *Fahey,* 332 U.S. at 253–54, 67 S.Ct. at 1555–56.

The case for the constitutionality of the summary procedure employed by the FHLBB in this action is arguably stronger than it was in *Fahey.* In 1954, after *Fahey* was decided, Congress amended § 1464(d) to specifically and expressly *authorize* the Board to appoint "ex parte and without notice" a conservator or receiver for an insolvent association.

The Supreme Court has cited *Fahey* on several occasions in support of the proposition that an *ex parte* appointment is constitutional in emergency situations. *See Fuentes v. Shevin*, 407 U.S. 67, 92 n. 26, 92 S.Ct. 1983, 2000 n. 26, 32 L.Ed.2d 556 (1972); *Parratt v. Taylor*, 451 U.S. 527, 538–39, 101 S.Ct. 1908, 1914–15, 68 L.Ed.2d 420 (1981), and *Hodel v. Virginia Surface Mining & Reclamation Ass'n.,* 452 U.S. 264, 299–300, 101 S.Ct. 2352, 2372, 69 L.Ed.2d 1 (1981).

Plaintiffs argue that the statutory criteria outlined in § 1464(d)(6)(A) do not constitute an emergency *per se.* Plaintiffs assert that even if one of the statutory criteria were to exist, the Board must make an additional finding that an emergency exists. Plaintiffs do not specify precisely what type of showing must be made to constitute an emergency though they argue that one of the factors to be considered is whether the association has a liquidity crisis. Plaintiffs

---

rights of Biscayne's Shareholders are subject to Biscayne's charter and to statutory provisions regarding the authority of the FHLBB to appoint a receiver. Absent a showing that none of the statutory criteria under § 1464(d)(6)(A) is met or that a constitutional deprivation has

occurred or that the Board has acted outrageously, the Court will not review the Board's exercise of discretion as to what would best benefit the association, its savers, and the FSLIC. *See* 12 U.S.C. § 1729(b), *supra,* note 2.

suggest that the classic liquidity crisis is when the institution is unable to meet the demand withdrawals of its depositors.

Plaintiffs rely on specific language in *Fuentes* to support their contention. *Fuentes* states:

There are "extraordinary situations" that justify postponing notice and opportunity for a hearing *Boddie v. Connecticut,* 401 U.S. [371], at 379 [91 S.Ct. 780, at 786, 28 L.Ed.2d 113]. These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance. Thus, the Court has allowed summary seizure of property to collect the internal revenue of the United States, to meet the needs of a national war effort, to protect against the economic disaster of a bank failure, and to protect the public from misbranded drugs and contaminated food.

*Fuentes,* 407 U.S. at 90–92, 92 S.Ct. at 1999–2000 (footnotes omitted).

The Court believes that Plaintiffs' contention is meritless. In the Court's opinion, the four criteria outlined in § 1464(d)(6)(A) constitute by definition "emergency situations". Neither the statute or the Congressional history indicates that such an additional showing must be made by the Board.

Statutory construction "must begin with the language of the statute itself," *Dawson Chemical Co. v. Rohm & Haas Co.,* 448 U.S. 176, 187, 100 S.Ct. 2601, 2608, 65 L.Ed.2d 696 (1980). "Absent a clearly expressed legislative intent to the contrary, that language must ordinarily be regarded as conclusive." *Consumer Product Safety Commission v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980).

The statute authorizes the Board to appoint "ex *parte* and without notice" a receiver for a federal savings and loan association, if, "in the opinion of the Board *a* ground for the appointment of . . . receiver as herein provided exists." 12 U.S.C. § 1464(d)(6)(A). Nowhere does the statute expressly or implicitly provide that the Board must make a determination that exigent circumstances, such as a liquidity crisis, must exist before it can act *ex parte.*

The legislative history of the statute reveals that Congress explicitly rejected any "emergency" requirement for the appointment of a receiver. Prior to the 1966 Amendments to the Housing Act of 1954, Pub.L. No. 83–560, Title V, Section 503(2), the statute provided in pertinent part:

"If in the opinion of the Board, a ground for the appointment of a conservator or receiver as herein provided exists *and the Board determines that an emergency exists requiring immediate action,* the Board is authorized to appoint ex parte and without notice a supervisory representative in charge of said association . . ." [Emphasis added.]

In 1966, the statute was amended and the above underlined portions were deleted. The legislative history provides:

The bill would eliminate the provision in the present section 5(d)(2) which authorizes the Board to appoint ex parte and without notice a supervisory representative in charge to take charge of the affairs of an association whenever, in the opinion of the Board, a ground exists for the appointment of a conservator or receiver, and the Board determines that an emergency exists requiring immediate action. Instead the Board would be given power and jurisdiction to appoint a conservator or receiver *ex parte* and *without notice* when, in its opinion, there exists one or more of the following grounds . . .

S.Rep. No. 1482, 89th Cong. 2d Sess., *reprinted in,* 1966 U.S.Cong. & Ad.News, 3532, at 3544 [emphasis added].

Congress considered legislative proposals in 1966 and explicitly rejected any "emergency" requirements for the appointment of a receiver. The Senate Bill, S. 3158, which contained the language that became the portion of the 1966 Act that amended 12 U.S.C. § 1464(d)(6)(A), was criticized by certain savings and loan associations precisely because there was no requirement that an emergency exist prior to the appointment of a receiver.[38] Congressman Pepper objected that S. 3158 "would empower the Board to appoint a conservator or a receiver *ex parte* and without notice to the institution involved, even in the absence of an emergency." Financial Institutions Supervisory and Insurance Act of 1966: Hearings on S. 3158 before the House Comm. on Banking and Currency, 89th Cong., 2d Sess. 164 (1966) House Hearings at 164. Congressman Pepper proposed HR. 17900 which would have maintained the statutory requirement of an emergency prior to the Board's *ex parte* appointment of a supervisory representative in charge. It also would have required a court hearing prior to the appointment of a receiver or conservator. Congressman Pepper's proposed bill was rejected and the language of S. 3158 amending § 1464(d)(6)(A) became law.

The Court does not find anything in *Fuentes* or in *Fahey* which contravenes this Court's belief that a finding of one of the criteria under the statute is *per se* an emergency situation entitling the Board to act *ex parte* so long as it does not constitute an abuse of discretion.

The findings of fact by the District Court in *Fahey* show that the association was solvent and that it was not suffering from liquidity crisis at the time that a conservator was appointed. *Mallonee v. Fahey*, 68 F.Supp. 418, 419 (S.D.Cal.1946). Despite the fact that the association was solvent and not experiencing a liquidity crisis, the Supreme Court upheld the appointment without requiring the Board to make an additional showing that an emergency situation existed.

The Court believes that Congress has given the Board the "exclusive power and jurisdiction" to appoint a receiver for an insolvent savings and loan association to enable it to deal effectively with the association's failing financial condition.[39] Congress sought to avoid loss to depositors, to preserve public confidence in savings and loan associations and to protect the FSLIC's insurance fund which is the backbone of the industry. The Court notes that Biscayne was a publicly owned stock association which was vulnerable to wide market fluctuations, insider trading and depositor runs. Were the Board to be prevented from acting until an emergency of the type envisioned by the Plaintiffs existed, the Board would lose its power to act until a catastrophe had befallen the institution. The restraint suggested by Plaintiffs contravenes the intent, purpose and language of the statute.

The Court believes that Plaintiffs' reliance on common law standards concerning the appointment of a receiver by a Court or the standards for the appointment of feder-

---

38. The National League of Insured Savings Association complained: "S. 3158 abolished the post of Supervisory Representative in Charge and in its place authorized the Board to appoint 'ex parte and without notice' (even in the absence of an emergency) a conservator or receiver if in the Board's opinion a ground for appointment exists as provided in the bill." Financial Institutions Supervisory and Insurance Act of 1966: Hearings on S. 3158 before the House Committee on Banking and Currency, 89th Cong., 2d Sess. 111 (1966).

39. Title 12, § 1464(d)(6)(A) affords the type of expedited hearing that would set to rest any serious due process argument that a hearing is mandated before the appointment of a receiver. The statute provides that when such an action is filed, it will be given precedence over other pending cases. "A fundamental requirement of due process is 'the opportunity to be heard'." *Armstrong v. Manzi*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965) (*citing Grannis v. Ordean*, 234 U.S. 385, 394, 34 S.Ct. 779, 783, 58 L.Ed. 1363 (1914). "It is an opportunity which must be granted at a meaningful time and in a meaningful manner." *Armstrong*, 380 U.S. at 552, 85 S.Ct. at 1191. In this case, a hearing was afforded within three (3) hours of the appointment of a receiver and within minutes of the filing of the complaint.

al equity receiver pursuant to Fed.R.Civ.P. 66 are inapposite to the present situation where an agency is acting pursuant to a constitutionally valid statute.

## COUNT V—EQUAL PROTECTION

The fifth count of Plaintiffs' complaint states that the FHLBB violated Biscayne's Fifth Amendment right to equal protection by placing Biscayne in receivership while not appointing a receiver for other institutions.

During the course of discovery Plaintiffs requested the following: copies of all the branch sale documents entered into between the FHLBB and other institutions; all assistance agreements entered into between the FHLBB and other institutions since January 1, 1980; all documents relating to the appointment of a receiver including all information concerning the amount and duration of withdrawals following the appointment; all documents relating to the decision to shop institutions which were not placed in receivership; and all documents reflecting the supervisory situation of every insolvent institution.

Defendants complained that the discovery request was onerous. Pursuant to Fed.R.Civ.P. 26(c) the Court ordered the Defendants to produce *inter alia* a list of all of the insolvent institutions in the United States and all documents relating to branch sales in the Atlanta and Washington, D.C. regions. The Defendants also produced several assistance agreements and a list of all institutions in the United States for which a receiver had been appointed.

In granting the initial discovery request, the Court maintained serious reservations about whether Count V could withstand Defendants' motion to dismiss. The discovery was allowed to provide the Plaintiff with an opportunity to meet the threshold issue presented by the motion to dismiss. The threshold issue is whether Plaintiff could allege a basis upon which the FHLBB discriminated against it. The parties briefed the issue and argued the motion on two separate occasions. Plaintiff was ordered to submit for an *in camera* inspection the factual underpinning of its argument based on what it had gleaned from the discovery.

Plaintiff asserted that the evidence showed that the Board had approved several other branch sales which delayed the institutions' projected insolvency and for which the institutions did not have to show long term viability in order to obtain Board approval. Plaintiff also argues that unlike Biscayne, other institutions were shopped before a receiver was appointed and that less drastic alternatives were chosen.

Plaintiff maintained that to make a prima facie equal protection claim it needed to allege the following:

(1) that similarly situated individuals were treated differently;

(2) that the differential treatment was intentional or purposeful; and

(3) that the disparate treatment is not rationally related to a legitimate governmental purpose.

Plaintiff argued that since it alleged the above cited elements, its claim should withstand a motion to dismiss under the dictate of *Cook & Nichol, Inc. v. Plimsoll Club,* 451 F.2d 505 (5th Cir.1976); *accord Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957).[40] On inquiry from the Court Plaintiff also stated that every time an aggrieved party alleges that an administrative agency violated his equal protection rights, he has a right to full discovery to try to substantiate his claim. On further inquiry from the Court, Plaintiff stated that it needed more discovery to try to determine why it was treated differently than other similarly situated institutions.

---

40. In *Cook & Nichol, Inc.,* the Court stated that:

"a motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would not be entitled to recover under any state of facts which could be proved in support of his claim."

*Cook & Nichol, Inc.,* 451 F.2d at 506.

■ The Court did not allow any further discovery on this issue and a trial on the merits was not had on the equal protection claim. The Court having previously reserved on Defendants' motion to dismiss Count V, it is the opinion of this Court for the reasons hereafter stated that Defendants' motion is GRANTED and Count V will be dismissed with prejudice.

Plaintiff has cited several cases in support of its claim. One line of cases stands for the proposition that when a statute, regulation or policy discriminates on its face, the onus is on the government to prove the constitutional validity of the discriminatory classification. *See French v. Heyne,* 547 F.2d 994 (7th Cir.1976); *Buckley v. Coyle Public School Systems,* 476 F.2d 92 (10th Cir.1973); *Otero Savings & Loan Association v. Federal Home Loan Bank Board,* 665 F.2d 279 (10th Cir.1981); *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975).[41] Since Plaintiff is not arguing that any of the statutes, regulations or policies discriminate on their face, the Court does not believe that the above cited cases bear on the present issue.

The second line of cases stand for the proposition that when an agency enforces a rule against similarly situated individuals, it must do so uniformly and in a nondiscriminatory manner. *See Zeigler v. Jackson,* 638 F.2d 776 (5th Cir.1981); *Gosney v. Sonora Independent School District,* 603 F.2d 522 (5th Cir.1979); *Trister v. University of Mississippi,* 420 F.2d 499 (5th Cir.1969); *Ciechon v. City of Chicago,* 686 F.2d 511 (7th Cir.1982).

The Court believes that the above cases are not directly applicable to the present case where Congress has granted discretion to the FHLBB in deciding how and when to assist ailing institutions and how and when,

if ever, to appoint a receiver. In the cases cited by Plaintiff, the policies or rules implicitly or explicitly created a class of similarly situated individuals. Each savings and loan association has a unique financial and organizational structure.[42] In the Court's opinion a more instructive case is *Butz v. Glover Livestock Commission Co., Inc.,* 411 U.S. 182, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973). In *Butz,* Plaintiff complained that the Secretary of Agriculture had imposed a harsher sanction on him than other violators. The Supreme Court, quoting an earlier decision held that "where Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy the relation of remedy to policy is peculiarly a matter for administrative competence." *Butz,* 411 U.S. at 184, 93 S.Ct. at 1457, [quoting *American Power Co. v. S.E.C.,* 329 U.S. 90, 112, 67 S.Ct. 133, 145, 91 L.Ed. 103 (1946) ]. The Court further stated:

> The Secretary's practice, rather, apparently is to employ that sanction as in his judgment best serves to deter violations and achieve the objectives of that statute. Congress plainly intended in its broad grant to give the Secretary that breadth of discretion. Therefore, mere unevenness in the application of the sanction does not render its application in a particular case "unwarranted in law."

*Butz,* 411 U.S. at 187–88, 93 S.Ct. at 1458–59. *See also Sartain v. Securities and Exchange Commission,* 601 F.2d 1366, 1375 (9th Cir.1979); *Harrington v. United States,* 673 F.2d 7, 11 (1st Cir.1982).

This Court recognizes that the appointment of a receiver should not necessarily be considered a sanction as were the agency actions in *Butz* and *Sartain.* On the other hand the Court believes that *Butz* supports

---

41. In *Buckley v. Coyle Public School Systems,* the Court also discussed briefly Plaintiffs' claim that "notwithstanding the charge that the policy discriminated on its face, the policy was applied in a discriminatory manner. Petitioner claimed that she was discriminated against because she was black." *Buckley,* 476 F.2d at 97. The Court's analyses in *Buckley* is not inconsistent with the Court's holding that Plaintiffs must allege the grounds upon which it has been discriminated against.

42. The Court also notes that in two (2) of the cases cited by Plaintiffs, there were references of discrimination against a protected class. *Zeigler,* 638 F.2d at 778–79 nn. 7–8 (plaintiff was black); *Ciechon,* 686 F.2d 511 (plaintiff was a woman).

the Court's opinion that where Congress has left to agency discretion the decision of how to deal with insolvent associations, Plaintiff can not complain that it received harsher treatment than did another insolvent association.

The Court's holding today is not meant to infer that the FHLBB has a free reign to discriminate against an association with whimsical impunity. The Court believes that Plaintiff may present a colorable equal protection claim if it alleges a basis upon which the FHLBB invidiously discriminated against it. Plaintiff must allege that the decision to appoint a receiver was based on an invidious basis such as race. Uneven treatment does not constitute invidious intent or discriminatory purpose. If Plaintiff can not meet this threshold showing, its complaint does not state a claim sufficient to survive a motion to dismiss.

The Court believes that the need for the Plaintiff to make a threshold showing of intentional or purposeful discrimination is analogous to cases concerning selective prosecution. *See Jackson v. Marine Exploration Co., Inc.,* 583 F.2d 1336, 1347 (5th Cir.1978). The Supreme Court has stated:

> [T]he conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation. Even though the statistics in this case might imply a policy of selective enforcement, it was not stated that this selection was deliberately based upon a unjustifiable standard such as race, religion or other arbitrary classification.

*Oyler v. Boyles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). *See also United States v. Chagra,* 669 F.2d 241, 247 (5th Cir.1982), *cert. denied,* 457 U.S. 907, 103

S.Ct. 102, 74 L.Ed.2d 92 (1982); *United States v. Torguata,* 602 F.2d 564, 569 (3rd Cir.1979) ("the defendant is obligated to make a threshold showing of discriminatory prosecution before an evidentiary hearing will be accorded on this issue").

On specific inquiry from the Court, Plaintiff admitted that it did not know the basis upon which it received unequal treatment nor did it allege that it was discriminated against on the basis of some impermissible classification.[43] Having been given the chance to obtain some discovery, Plaintiff was still unable to make the requisite allegation to meet the threshold issue.

## COUNT II—ABUSE OF DISCRETION

Count II of the complaint alleges that the actions of the staff and of the Chairman throughout the sixteen months of negotiations were arbitrary, and capricious and purposely misleading. Plaintiffs' argument rests on the confluence of several crucial factors concerning the manner in which the FHLBB conducts its business and the way in which this *modus operandi* was utilized by the Defendants to deceive the Plaintiffs.

One of the crucial factors cited by the Plaintiffs is the lack of discernable rules or regulations delineating the parameters of what the Board considers to be acceptable proposals for troubled associations seeking to avert insolvency. Plaintiffs argue that the staff has arrogated, with the Board's *de facto* blessings, the power to make policy and determine the outcome of a proposal in conjunction with the Chairman of the Board. According to Beesley's testimony, if such policy exists, it is made on an *ad hoc* basis and varies with the peculiarities of each case. The staff, by rejecting or rec-

---

**43.** Plaintiffs refer to an internal FHLBB memo from Mark Rundle to James Croft on March 10, 1983, which states at one point: "We see very little distinction between the Chase and Biscayne proposals." The memo goes on to state that the difference between the two (2) transactions "is reflected in the impact on the solvency of the two associations." It noted that it calculated a profit for Biscayne significantly less than Biscayne had estimated. It also stated that the FHLBB "had no assurances that Biscayne's game plan would result in a profitable

association in the future." While the memo notes that a strong similarity exists between the two proposals, the more important comment concerns the different impact the sales would have on the respective institutions. This underscores the Court's belief that the two (2) institutions are not similarly situated for equal protection purposes. Regardless, the Court believes that the comments in this memo, even when interpreted in the most beneficial light for Plaintiffs, does not state sufficient allegations to constitute an equal protection claim.

ommending proposals or aspects of a proposal before they reach the Board, shapes Board policy and effectively decides whether a proposal will be approved. The Board has never accepted a proposal without the staff directors' imprimatur.

Plaintiffs assert that, having interjected himself as the chief negotiator to whom the staff turned for guidance in its discussions with KB, Pratt understood that his views were being represented to KB by the staff. Pratt also knew that, in the absence of rules or regulations, KB would rely on what the staff communicated to them as the only source of guidance and as being Board policy. Plaintiffs were led to believe that if they satisfied the Chairman's concerns during the negotiation process, then their proposal would be approved when it came up for a vote before the Board. By acting as the chief negotiator, Pratt set the agenda for the entire Board and could reject a proposal or an element of a proposal before it ever reached the entire Board. The evidence also indicates that the Chairman's concerns were ultimately embodied in the staff recommendation. The testimony indicates that the Board had never turned down the staff recommendation. Plaintiffs believe that Pratt knew that an indication to KB of the staff approval was tantamount to assuring KB that a proposal would be accepted. Plaintiffs also believe that Pratt understood that any questions he expressed concerning aspects of the proposal would be conveyed to KB.

Defendants do not fundamentally contradict Plaintiffs' characterization of the FHLBB's *modus operandi,* and neither do they refute the important role that Pratt had in overseeing the negotiations in this case since the beginning of January 1983. Nonetheless, Defendants contend that the Board has broad discretionary powers in deciding when and how to assist an ailing association pursuant to 12 U.S.C. § 1729(f)(1).[44] Furthermore, Defendants contend that the staff has the power to negotiate proposals for the Board and that Pratt has broad discretion to act as a chief negotiator. Defendants argue that the statute mandates the Board to be solely responsible for setting and carrying out Board policy. Staff actions, according to the Defendants, cannot be imputed to the Board nor to its Chairman.

■ Having extensively reviewed the testimony and the exhibits in this case, the Court is led to the inescapable conclusion that the Plaintiffs' characterization of the FHLBB's method of operation and of the extent of Pratt's involvement in this case is essentially accurate. The Court agrees with Defendants that the FHLBB is vested by Congress with broad discretion and relatively few statutory guidelines. However, the Board's decision not to enact guidelines, policies, rules or regulations to which an association can refer in looking for guidance has led to a situation where the Board functions in great measure through its staff. The actions and decisions of the staff on a daily basis are, under the direction of its Chief Executive Officer, the Chairman of the Board, the policies ultimately approved by the Board.

An agency of the Government which fails to establish rules, regulations or policies that govern the conduct of the Board and its staff and which fails to enact guidelines and standards governing those whom it regulates should not be permitted to defend the impropriety of its staff's conduct by invoking legal formalisms that allow only the Board to establish policy or that permit only the Board's actions to be open to adjudication. This Court emphasizes that the cloak of legal formalism cannot be worn when the staff's improper acts occur while the staff is formulating Board policy and guidelines on a case-by-case basis under the

---

**44.** The power of the FHLBB to assist an ailing institution is outlined in 12 U.S.C. § 1729(f)(1) which states:

(f)(1) In order to prevent a default in an insured institution or in order to restore an insured institution in default to normal operation, the Corporation is authorized, in its discretion and upon such terms and conditions as it may determine, to make loans to, to purchase the assets of, or to make a contribution to, an insured institution or an insured institution in default.

direction of the Chairman. To conclude otherwise would be tantamount to sanctioning an unbridled exercise by the Chairman to set policy and negotiate through his staff in the name of Board policy while disclaiming any Board responsibility for the staff's arbitrary and capricious behavior. The Board must take responsibility for the chasm it has created between its statutory mandate and its manner of operating when the victim of the chasm is being thrown from one cliff to another.

Where the conduct of the staff taken as a whole reaches a level which can only be described in its totality as outrageous, that conduct must be imputed to the Board in determining whether under those circumstances the Board actions constitute an abuse of discretion. In this setting, the staff must be viewed as agents of the Board, particularly where the Chairman of the Board is the Chief Executive Officer of the staff. Under these circumstances, one abused by "outlandish" conduct must be allowed to impute such conduct to the agency where the board has acted in reliance upon the very staff accused of the misconduct.

The facts in this case demonstrate that at crucial points in the negotiations the staff acted egregiously. The Court does not reach this conclusion lightheartedly nor does it believe that the staff acted outrageously throughout the entire sixteen months. There is no evidence indicating that the staff conducted itself in anything other than a professional manner during the first phase of negotiations, which terminated in July 1982.

The pattern of staff abuse commenced during the negotiations concerning the branch sale proposal with Cal.Fed. The Court does not find, as Plaintiffs argue, that the staff's decision to contract with several outside investment consultants demonstrates arbitrary or capricious behavior.

The Court is troubled by the staff's reliance on the erroneous analyses performed by the Quantitative Analysis Division as the primary reason for telling KB that the staff would not recommend the proposal. The Court believes that neither McGuirk or Croft knew that the projections were based on "clearly erroneous assumptions". However, given the wide disparity between QAD's analysis and the one undertaken by KB, the Court believes that the staff *should* have endeavored to determine the cause of the discrepancies, especially since KB was more than willing to meet with QAD to explain its computation and proposal.

The Court believes that the staff's reliance on the QAD analysis does not of itself constitute an abuse of discretion. Yet, after having made the determination that it would not recommend the proposal in the beginning of January 1983, the staff's actions from thereon changed from relative candidness to deception.

At the January 5 meeting, Croft and Beesley stated that the staff would not recommend the branch sale as it had been structured. Being satisfied with the date and rate of the transaction and other matters, the staff concerned itself with whether Biscayne would be a "viable" institution after the branch sale. This was based, in large part, on the erroneous projections of QAD. KB specifically asked how it could supplement the proposal to satisfy the staff's concerns. The staff indicated that the proposal should be modified to provide for the infusion of $9–$18 million by KB and that it should be accounted for in the manner suggested by the staff.

KB returned on January 14 with a new recapitalization proposal in case the branch sale was deemed to be unacceptable. KB also stated that it was prepared to meet the staff's demands outlined on January 5 regarding the branch sale proposal. KB was told that the staff never stated that it would be satisfied if the two criteria were met. KB inquired of the staff as to what more the staff required to quell its anxieties about the branch sale. The staff refused to offer any guidelines. KB repeated the request in its letter of January 17. Although Croft indicated to other staff members that KB misunderstood his January 5 statements, no clarifying letter was sent to KB.

The Court finds that the staff's decision not to provide guidelines after having shifted its negotiating stance between January 5 and January 14 and after KB had invested a great deal of expense and time was without justification. More troubling, however, is the inescapable conclusion that the staff wanted the branch sale to expire of its own accord on January 31 without the appearance that the failure to gain approval was due to FHLBB misconduct.

The Court bases this conclusion in part on the actions of the staff at the meetings on January 5 and 19. The Court also reaches this conclusion based on a memorandum sent by Hayes to the three staff directors, Vartanian, Beesley and Croft, as well as to Buchanan, the Executive Staff Director who briefed Pratt on Board matters. The memorandum states in pertinent part "[t]he staff believes that no letter should be issued setting forth conditions on which the branch sale would be approved. The Cal. Fed. agreement will terminate January 31 if not closed by then, but this does not release parties from observing the 'best efforts' requirements of the agreement to that date." To this paragraph Vartanian wrote, "concur".

In further seeking to have the branch sale fade away and have Plaintiffs abandon the proposal altogether, the staff led the Plaintiffs to believe that it would recommend the recapitalization proposal and that Pratt had approved of the two major points in the recapitalization proposal. This was conveyed in Beesley's statement on January 19 that he had discussed the proposal with Pratt and that it was "Christmas in January".

While the staff was conveying this impression to KB, at least two staff directors—Beesley and Vartanian—knew that they had serious reservations and could probably never recommend the recapitalization proposal because of the nonrepayable contribution by FSLIC. Beesley testified that from the time the proposal was presented he had philosophical problems with the nonrepayable aspect. There is no indication that he ever wavered from that belief. Vartanian's notes on Hayes' memorandum, recorded on January 24, state that he thought that the proposal was "a terrible mistake" and that the proposal should be repayable through the issuance of ICC's.

The evidence is clear that by the end of January, but before January 31, the negotiations were wrapped in a shroud of deception. The staff directors knew that they would not recommend the proposal. At the same time, they led Plaintiffs to believe that a recommendation would be given and that the Board, based on Pratt's representations to Beesley, would approve the proposal. The other staff members believed that the proposal would be approved; they had drafted a recommendation in favor of the proposal based on what it perceived to be the position of the staff directors. Pratt testified that he believed that the proposal would be recommended. The fact that Pratt had expected a recommendation and had not even asked the staff to draw up contingency plans prior to the March 17 meeting speaks to his surprise. It also clearly highlights Plaintiffs' point that without a favorable staff recommendation, the Board would not approve the proposal despite the fact that Pratt had intended to approve such a proposal.

Despite the staff's attempt to have Plaintiffs abandon the branch sale, Plaintiffs negotiated an extension of the branch sale until March 4. The evidence indicates that on at least two separate occasions in February KB requested for the branch sale to be approved should the recapitalization proposal prove unsatisfactory to the staff directors. Broad indicated this in his February 7 letter to Beesley and Croft; Wittie indicated the same to Rundle towards the end of that month.

In light of the staff's continuing deception from January 1983 until March 1983, the Court believes the actions occurring thereafter are essentially irrelevant to the Court's finding of abuse of discretion. The damage had already been inflicted and the branch sale had expired for the last time. The fact that KB could not specifically state at the end of March that it would

reconsider the nonrepayability aspect of the recapitalization proposal does not clothe the stark reality that during the time when the branch sale was still alive, the staff directors never indicated that nonrepayability was an aspect which concerned them.

The Court believes that its holding today upholds the statutory scheme mandated for the Federal Home Loan Bank Board. The Court acknowledges that Congress has vested the Board with broad discretionary powers to administer the agency, to address emergency situations and to protect the financial integrity of its member institutions for the benefit of depositors and the FSLIC insurance fund. The statutory scheme does not provide the FHLBB with omnipotent discretion to conduct its affairs above judicial review. When discretion becomes a code word for deception and when the agency strays from its mandate to safeguard the integrity of the association, the Court has a duty to find that the agency has acted arbitrarily and capriciously.

The Court emphasizes that it does not ascribe a vindictive motive to the staff's actions. Nonetheless, the evidence clearly demonstrates that the manner in which the Board has chosen to operate makes it vulnerable to egregious behavior by its staff directors. The deception perpetrated on the Plaintiffs in this case caused them to expend a great deal of time and expense for what was essentially a charade.

## RELIEF TO BE GRANTED

This Court's Memorandum Opinion has addressed itself solely to the issues surrounding the appointment of the receiver by FHLBB on April 6, 1983, and has found in favor of the Plaintiffs on the issue of abuse of discretion set forth in Count II of the Complaint. This Opinion is not intended as a Final Judgment. There remains for this Court the complex issue of how to fashion the relief sought by the Plaintiffs so that the transition of control from receivership to Biscayne can occur in an orderly manner and with due concern for the rights and interests of the depositors, the public and all others whose rights may be affected by such transition, as well as with due regard for the duties and responsibilities of FHLBB, FSLIC, the officers and directors of "old" Biscayne and New Biscayne, and the stockholders of "old" Biscayne.

The Court recognizes that the complexity of this issue is compounded by the infusion of substantial sums of money by FSLIC to New Biscayne (estimated on the evening of April 6 to be in the amount of $30 million).

This Court finds itself in the role of harbinger insofar as fashioning such relief, since the few courts which have dealt with this statute over its fifty-year history have never restored an insolvent institution to the association.

Nowhere in the pleadings heretofore filed before this Court nor in the extensive testimony offered to this Court has this issue been addressed by the parties. This void necessitates delaying entry of Final Judgment in this cause until such time as the parties have filed briefs and this Court has conducted a hearing, evidentiary in nature if required, to determine how such relief may best be implemented. Pending the entry of such a Final Judgment, this Court will continue to maintain the *status quo* as it has since the commencement of these proceedings on April 6, 1983.

It is the desire and intent of this Court that the parties meet and confer within thirty (30) days from the entry of this Memorandum Opinion for the purpose of determining whether an amicable resolution of this remaining issue can be achieved. In the absence of such a resolution, this Court is prepared to ultimately resolve the same and embody that determination in its Final Judgment.

Based upon the above and foregoing, this Court finds as follows:

1. This Court finds in favor of the Plaintiffs as to Count II of the Complaint.

2. This Court finds in favor of the Defendants on Counts I, III and IV.

3. Defendants' Motion to Dismiss Count V is GRANTED with prejudice.

4. The parties are ordered by this Court to meet and confer within thirty (30) days from the entry of this Memorandum Opinion in an effort to determine whether or not an amicable plan can be devised for dissolving the receivership and restoring Biscayne. Within forty (40) days from the entry of this Memorandum Opinion, the parties will report to this Court as to whether or not such a resolution of the matter can be accomplished. If the report favorably indicates the same, additional time will be granted to formulate the joint plan. In the event that the report indicates that such a joint plan is not feasible, the parties will be required to file with this Court within sixty (60) days from the entry of this Memorandum Opinion briefs outlining their respective plans suggested to this Court to implement the relief sought by the Plaintiffs. This cause be and the same is hereby set for hearing on the issue of the relief to be granted and set forth in this Court's Final Judgment commencing at 9:30 a.m. on Monday, November 21, 1983, Courtroom 7, 7th Floor, Federal Courthouse Square, 301 North Miami Avenue, Miami, Florida.